Filed 8/1/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S139103 |
| v. | ) | |
| | ) | |
| BAILEY LAMAR JACKSON, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. RIF97839 |
| _____ | ) | |

Defendant Bailey Lamar Jackson was convicted by a jury of first degree murder (Pen. Code, § 187, subd. (a); all further statutory references are to the Penal Code unless otherwise indicated), first degree burglary (§ 459), and first degree robbery (§§ 211, 215, subd. (a)) of Geraldine Myers. The jury found true the special circumstance allegations of robbery murder and burglary murder. (§§ 190.2, subd. (a)(l7)(A), (G).) Jackson was also convicted of attempted murder (§§ 187, subd. (a), 664, subd. (a)), first degree burglary (§ 459), first degree robbery (§§ 211, 215, subd. (a)), torture (§ 206), forcible rape (§ 261, subd. (a)(2)), forcible oral copulation (§ 288a, subd. (c)(2)), and sexual penetration with a foreign object on an unconscious person (§ 289, subd. (d)) against Myrna Mason. The jury found true allegations that Jackson personally inflicted great bodily injury on a person 70 years of age or older in the commission of the attempted murder and torture. (§§ 12022.7, subd. (c), 1192.7, subd. (c)(8).) In connection with the rape and forcible oral copulation charges, the jury found true

that Jackson inflicted aggravated mayhem or torture on Mason (§ 667.61, subd. (d)(3)), that he entered her house with the intent to commit a violent sexual offense (§ 667.61, subds. (c) & (d)(4)), and that he personally inflicted great bodily injury on Mason (§ 667.61, former subd. (e)(3)). The jury also found that Jackson had been convicted of two prior prison offenses (§ 667.5, subd. (b)), two serious prior felonies (§ 667, subd. (a)), and two serious or violent felonies within the meaning of the "Three Strikes" law (§§ 667, subds. (c), (d)(2), & (e)(2)(A), 1170.12, subd. (c)(2)(A)).

The jury was unable to reach a penalty verdict. A new jury was empaneled and the penalty phase was retried, resulting in a verdict of death. The trial court denied the automatic motion to modify the penalty, sentenced Jackson to death for the count of murder, and imposed a sentence of 212 years to life on the remaining counts. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) We remand to the trial court to recalculate the noncapital portion of Jackson's sentence. In all other respects, we affirm the judgment.

## I. FACTS

### A. Guilt Phase

In May 2001, 82-year-old Geraldine Myers disappeared from her home in Riverside, California. Her car was later located in Las Vegas, but her body has not been found. Six weeks later, Myrna Mason, an 84-year-old woman living alone in the same neighborhood, was raped in her home. Jackson was arrested the following day for Mason's rape. The investigation yielded evidence suggesting that Jackson was also involved in Myers's disappearance, which led to further investigation specifically designed to connect Jackson with the Myers case. The following factual summary roughly tracks this chronology. Thus, certain evidence

2

relevant to the Myers case (most notably, evidence derived through dog trailing) follows the discussion of the Mason case.

1. Prosecution Evidence

a. Discovery of Myers's Disappearance

Myers's daughter-in-law Monique testified that, on Mother's Day, May 13, 2001, she took Myers to a Sunday service at the Arlington Christian Church. Later that evening, one of her sons, William, took her to dinner. William and Myers returned to her home between 7:00 and 7:30 that evening, and he stayed with his mother until about 8:45 p.m. Monique called Myers several times throughout the following day (May 14), but received no answer. After speaking with her brother-in-law, Richard Myers, who had similarly been unable to reach Myers that day, Monique decided to see if Myers was home. Monique went to Myers's house on San Simeon Way at around 9:00 p.m. that night, but no one answered the door. Monique obtained a key to the back door (which was locked) from the property manager and entered the house. She looked around for five or 10 minutes and walked down the hallway and into the living room, but did not go into either bedroom. There was a light on in the living room, but the rest of the house was dark. She checked the front door and found it locked. She did not notice anything unusual, so she returned the spare key and went home.

Monique called Myers the next morning and again received no answer. Monique then called her daughter, Robin Myers Wilson, and instructed her to go to Myers's home to "see what's going on."

Robin Myers Wilson testified that, on May 15, 2001, after speaking with her mother, she went with her younger sister Deanna to Myers's home. Wilson immediately noticed that something was wrong: cleaning products were in disarray, Myers's shoes were scattered on the floor, and a window curtain was

3

lying in the sink. Wilson recognized Myers's purse in the kitchen. Walking further into the house, Wilson noticed an apparent bleach stain in the hallway, which had not been there when she had visited the Saturday before, as well as a torn envelope on Myers's bed. In the spare bedroom, Wilson found a dress and pantyhose lying on the floor. (Roberta Myers, Geraldine Myers's daughter-in-law, described this as the black skirt that Myers had worn on Mother's Day. Deanna described it as the blue dress Myers had worn that day.) Wilson called her mother to tell her that something was wrong and then called 911 to report that Myers was missing.

b. Preliminary Investigation of Myers's House

Riverside Police Officer Robert Arnold testified that he took a missing persons report from Myers's son, Douglas, and then drove to her home at around 12:30 p.m. on May 15, 2001, to investigate. He walked the perimeter of the house and did not see any signs of a forced entry or a disturbance within the house.

Riverside Police Sergeant Victor Williams testified that, on the afternoon of May 15, 2001, he went to Myers's house to collect evidence in relation to the missing persons report. In front of the house, Williams found newspapers from Monday, May 14, and Tuesday, May 15. As he walked through the house, a stain in the hallway "stood out" to him. It looked like a bleach stain but gave off no distinctive smell. Williams also noted a strike mark on the door opening from the hall into the living room, which was shallow and appeared to have been made by a hard object. White marks around the same door suggested that it had been recently cleaned. Similar marks were visible on the door from the hallway to the laundry room.

Williams found two empty beer bottles and an empty water bottle in a garbage bag in the laundry room. These items did not yield DNA or latent

4

fingerprints. William Myers, Myers's son and the last person to leave her house on Mother's Day, testified that neither he nor Myers consumed beer that evening.

Williams also found approximately $8,000 in cash and bags of coins in Myers's bedroom closet.

c. Recovery of Myers's Car in Las Vegas, Nevada

Las Vegas Police Officer Steven Perry testified that, on May 18, 2001, he stopped a red Toyota Corolla, later identified as Myers's car, outside the city for a lane infraction. The driver was 16-year-old Donald Rogers. Rogers told Officer Perry that he had found the car in a Las Vegas parking lot with the keys in the ignition and decided to take it. During an inventory search of the vehicle, officers found a Macy's shopping bag in the trunk that appeared to have blood on it.

Federal Bureau of Investigations Special Agent Lawrence Wenko testified that he lifted 21 latent fingerprints from the vehicle, none of which belonged to Jackson. Wenko also collected the Macy's bag, an aqua-colored wallet, and a white plastic bag containing shoes and other items, all of which he checked for hair and fibers. He collected soil and debris from the passenger side rear bumper. He did not identify any blood in the vehicle, other than what was on the Macy's bag. He obtained video surveillance tapes for May 16 and 17, 2001, from the store where Rogers said he had found the car; no earlier surveillance tapes were available.

Rogers testified that he stole Myers's car from the parking lot of a shopping center. He was looking for a car to steal, saw that the keys to the Corolla were in the ignition, and decided to take it. Rogers drove the car around with his friend, Jose Davila, and several of Davila's cousins. He recalled being surprised by how empty the vehicle was; he did not find anything in the passenger compartment or glove box, not even a vehicle registration. He described the trunk, however, as

5

full of "[a] lot of shoes and crayons and a bloody bag." Rogers did not recall taking anything from the trunk, except some crayons for Davila's sisters. Rogers testified that he and his friend played with the bag, teasingly pushing it towards each other, and that, in the process, he may have taken it out of the trunk and put it back in, although he was not "a hundred percent sure."

Rogers's statements were inconsistent as to the date on which he found Myers's car. At the time of his arrest, he told Officer Perry he had taken it on Thursday, May 17. During an interview several weeks later, he told Riverside Police Detective Bill Barnes that he had taken it on Wednesday, May 16. At trial, Rogers testified that he found the car on either Monday, May 14, or Tuesday, May 15, but that he could not say for sure which of the two dates was correct.

Detective Barnes traveled to Las Vegas on Friday, May 18, 2001 to inspect Myers's car and interview Rogers. Barnes testified that Rogers expressed shock upon learning that the car was connected to a murder. Rogers told Barnes that he did not have ties to Southern California and had never been to Riverside.

California Department of Justice (DOJ) fingerprint analyst Linda Senteney analyzed the fingerprints lifted from the items in the trunk of Myers's car. Senteney was unable to match the prints to anyone connected to the case, other than Rogers and Davila. Riverside County Sheriff's fingerprint examiner James Edmonston was likewise unable to match any of the prints to anyone related to the case, other than Davila and Officer Perry.

d. Jackson's Location on Mother's Day 2001

Angielina Fortson testified that she became romantically involved with Jackson in the spring of 2000. About one-and-a-half months before the assault on Mason, Jackson came to stay with Fortson, who was living with her mother, Billie Harris, on Lassen Court in Riverside.

6

Fortson testified that Jackson had gone outside to lift weights at some point after dark on May 13, 2001. She heard him lifting weights for 25 to 30 minutes, but he did not come back inside for over two hours. When he returned later, Fortson noticed that he was sweaty. He told her he had gone to have a few beers with their neighbor, Richard Shrader. Jackson and Fortson fell asleep; when Fortson woke up at 9:00 a.m. the next morning, he was gone. He returned late that evening and told her that he had been working with his friend, Joe Taufaao.

On cross-examination, Fortson stated that she could remember the events of May 13, 2001, distinctly. She had been upset that day because her ex-husband was supposed to bring her son to visit, but did not. She and Jackson drove Harris's car to Jackson's mother's home. Then they returned to Harris's house. Fortson's sisters and nephew came over and Fortson braided hair for her nephew and several of his friends. Her sisters did not leave until 11:30 at night. At some point after dark but before her sisters left, Jackson went outside to lift weights. When everyone had left, Jackson comforted Fortson and the two had sex until early in the morning, then fell asleep. When Fortson woke up at 9:00 a.m., he was still there. She fell asleep and woke up later in the morning or early in the afternoon. By then, he was gone and he did not return until late in the evening.

Richard Shrader's wife Debra testified that, at 9:30 p.m. on May 13, 2001, Jackson had tapped on their window and Richard had gone outside to talk to him. Jackson asked Richard if he could borrow $40. Richard said he would have to ask his wife and went inside his house. Later that night, Jackson came to the door and asked again. Richard declined to lend him the money. However, they had not lifted weights together or gone to a bar. Richard does not drink because he is a recovering alcoholic.

In April 2003, investigator Martin Silva from the district attorney's office interviewed Fortson's daughter, Sheena. Sheena told Silva that, after Mother's

7

Day of 2001, her mother was "gone for like two or three days," though she did not know where because her mother did not usually tell Sheena where she was going. Sheena told Silva that she thought Jackson was with her mother and that they left on the afternoon of Mother's Day. At trial, Sheena testified that she did not remember making these statements. With respect to Jackson's whereabouts, she stated, "I didn't say he was gone with her. I said she was gone."

Police interviewed Jackson's friend Taufaao on June 22, 2001. Taufaao said that Jackson and Fortson did not take trips. A detective responded, "Cause [Jackson's] telling us and Angie is telling us that they made a trip to Vegas." Taufaao responded that although he didn't know any details, he heard Jackson and Forston saying something about how they went to Las Vegas. At trial, Taufaao did not remember telling the police about a trip to Las Vegas. Instead, he said he remembered the couple talking about going to Vegas in the future, not returning from a recent trip. He recalled going out to dinner with his family on Mother's Day, but did not know whether he had seen Jackson either that day or the day after.

e. Additional Evidence Related to Myers's Disappearance

In a locked cabinet in Jackson's bedroom at his parents' house, police found an article about Myers's disappearance clipped from a local newspaper.

Investigator Silva testified that prints found in Myers's bathroom were made by a pair of Vans shoes. Dana Guidice, vice president of product development for Vans, testified that the prints were made by shoes with a "wafflecup" sole, a feature that was used in only two models: the Blake and the Gravel. According to Guidice, approximately 20,000 to 30,000 pairs of the two patterns total were sold in the United States, primarily in Southern California. At

8

trial, Fortson was shown a picture of a Blake shoe. She testified that Jackson wore that type of shoe when he mowed the lawn.

Myers's friend, Lilia Alberga, testified that Myers had blondish-reddish hair that she had styled at the beauty parlor every week.

Loujean Price, a neighbor who shared a wall with Myers, testified that Myers would take her trash out to the dumpsters across the alley about three times per week, usually between 10:30 and 11:00 p.m. At around 11:00 p.m. on Mother's Day 2001, Price heard three taps from Myers's side of the wall, which sounded like someone was hammering a nail into the wall. She did not hear anything else before or after that.

California Department of Justice Senior Criminalist Mark Traughber examined articles of Jackson's clothing. One of his shirts had several holes ringed by discoloration, which Traughber found consistent with bleach stains. Traughber visually examined the stain on Myers's hallway carpet and chemically tested the carpet, the padding beneath it, and the wood floor for blood. He also tested stains near the bathroom. These tests were negative for blood. Traughber noticed a small bloodstain on a heater grate, which matched Myers's DNA profile.

Traughber testified that there is no direct test that can be done to determine whether the stain on the hallway carpet was caused by bleach. He acknowledged the possibility that bleach would trigger a false positive result from the two tests he used to check for blood. He also testified that bleach is "very unstable when you take it out of that bottle, or you start to dry it," and will "react with anything around it and oxidize it" or decompose into salts and oxygen. He also testified that it was "common knowledge" that bleach could completely destroy blood. After giving this testimony, Traughber conducted several experiments to determine whether bleach could destroy blood, and how long bleach left exposed

9

to the air would falsely test positive for blood.  These experiments are discussed further below.  (*Post*, at pp. 81–83.)

> f.  Assault on Mason

At 3:50 a.m. on June 22, 2001, Riverside Police Officer Raymond Soto was dispatched to Mason's house on Lassen Court.  On the stand, Soto recounted the details that he heard Mason tell the paramedics about the assault.  Mason died before Jackson's trial.  On June 22, 2001, while she was in the hospital, Mason recounted a similar set of facts in a recorded interview with Detective Jeffrey Joseph, which was played for the jury.  She also testified at a preliminary hearing on July 17, 2002.  Her hearing testimony was read aloud at trial.  Her statements were consistent on all occasions.

She described staying up reading until 1:30 in the morning and then going outside to turn the water off.  She had left her garage door slightly ajar because it was a hot day and there was a refrigerator in the garage.  When she went back inside, she locked the door behind her, and turned to see a man wearing a ski mask step out from behind her washing machine into her hallway.  He pushed her down to the floor and began choking her.  Then he stood up and pushed her into the bedroom.  He pushed her onto the bed, told her to take her clothes off, and slapped her on the back with his open hand.  It hurt, and she told him that she had rods in her back.  He took off his ski mask, but she did not see his face.  He told her repeatedly that if she looked at him, he or "his buddies" would kill her.

Mason described the details of the sexual assault.  "He fondled my breasts briefly and he did not try to penetrate me, but he just used his penis to just touch me. . . .  [¶] From front to back between my legs."  He forced her to perform oral sex on him, something she "never ever had anything to do with . . . in my life," and which she found offensive.  He asked, " 'You sure you never done this

10

before?' " He choked her again, "[w]orse than the first time," and she felt she was about to lose consciousness. At some point, she did lose consciousness. When she woke up, she was toward the end of the bed with her legs hanging over the foot of the bed. There was blood "puddled" in both her ears. She found she was unable to stand up. "I couldn't understand why I couldn't get up and — until I looked around and noticed that there was a garden rake handle that he had thrust into my vagina. . . . [¶] I think there was blood on it about three or four inches down the handle from the end of the handle." She removed the rake, took a few steps, and began to have diarrhea; she ran to the bathtub to wash herself, got dressed, and called 911. Among the injuries she sustained to her vagina, neck, and eardrums, she lost her singing voice and was unable to resume singing with her choir after the assault.

Patricia Forst, an emergency room nurse responsible for clinical forensic examinations of sexual assaults, interviewed and examined Mason at the hospital. Forst testified that her physical examination corroborated Mason's account of the assault. Mason suffered bruising on her hip and thigh, as well as her wrists, hands, and forearms. She had petechiae (small broken blood vessels) on her face and in her eyes, consistent with choking, as well bleeding in both ears, loss of hearing, and bruising to her neck, jaw, and throat. She also had bruising on her tongue and lacerations on her external genitalia and vaginal vault. Mason told Forst that her assailant threatened to kill her or have his "gang members" kill her if she called the police.

At 6:10 a.m. on June 22, 2001, Riverside Police Detective Derwin Hudson arrived at Mason's house. He searched the area and found a woman's purse, later identified as Mason's, in a trash can one block from Mason's house. The trash can belonged to the Shraders. Hudson left the purse in the trash can, notified his

11

sergeant that it had been found, and waited by the trash can for a technician to come and retrieve it.

Senior evidence technician Tim Ellis testified that he arrived at Mason's house at 6:50 a.m. on June 22, 2001. He took a number of photographs of the house and its surroundings. He testified that he noticed Mason's garage door was open approximately 13 inches, which was enough space for someone to crawl in.

Fortson testified that her mother woke her up at around 7:00 or 8:00 a.m. on June 22, 2001, and told her that the police were outside. The police entered the room where Jackson and Fortson had been sleeping. They asked about several television sets that were in the room, one of which was later determined to be Mason's (the serial number matched the number on a warranty card provided by Mason). Police arrested Jackson that morning and took him and Fortson to the Spruce Street police station to be interviewed. Riverside Police Sergeant Kevin Stanton testified that Mason's checkbook was found stuffed inside Fortson's purse. Shrader testified that on the night of June 21, 2001, Jackson knocked on the Shraders' door around 8:00 p.m. Jackson asked Richard if he could borrow $20. Richard lent him $15.

Mehul Anjaria, a DNA analyst from the San Bernardino Sheriff's crime laboratory, analyzed a bloodstain on a pair of Jackson's pants. She testified that the DNA profile matched Mason's at 13 points. She estimated that only one in 120 quadrillion Caucasian women would have a matching profile. (A quadrillion is the product of one million and one billion.) The probabilities that the profile would match a black or Hispanic woman were even lower.

California Department of Justice Criminalist Michelle Merritt, an expert in shoe impressions, testified about the shoe print found in the dirt outside Mason's home. While there were no uniquely identifying marks, Merritt concluded that the

12

print was left by a shoe whose design, size, and wear were consistent with shoes owned by Jackson.

g. June 22, 2001 Dog Trailing

Riverside Deputy Sheriff Coby Webb, a canine officer, arrived at Mason's house on the morning of June 22, 2001, accompanied by a bloodhound, Maggie Mae, who had been trained to trail human scent. Webb used a "device that sucks up scent onto a gauze pad," referred to as a "scent transfer unit," to vacuum the scent from the shoe print found in the freshly raked dirt outside Mason's home and transfer it onto a gauze scent pad. Webb presented the scent pad to Maggie.

Webb testified that Maggie trailed from outside Mason's home across the street and around the trash can that still contained Mason's purse. Maggie continued from there to the Shraders' porch, then turned and walked to Harris's backyard, at which point she seemed confused and appeared to have lost the trail. Webb testified that this reaction may have been the result of "pooling," which occurs when many trails of the target scent overlap at a single location. Webb testified that pooling can occur at the residence of the person who left the scent the dog is trailing.

Webb and Maggie were called to the Spruce Street police station. Webb was asked if she and Maggie could trail to or eliminate a suspect who was detained inside the station. In the lobby, Webb presented Maggie with the scent pad collected from the shoe print outside Mason's house. Maggie trailed through the police station and into an interview room where Jackson was seated with a police officer. Maggie did not "commit herself to jump up" on Jackson, but she approached him and stopped trailing. Webb testified that when Maggie "gets confused, she will just stop, which tells me she did not know which subject was the possible suspect." Webb noticed that the air conditioning was on in the

13

building, which she said made it harder for Maggie because "that person's scent is going all through the air-conditioning vents." Webb had to pull Maggie out of the room, which further suggested to Webb that Maggie had located the person she was trailing.

### h. Jackson's June 22, 2001 Police Interview

The day Jackson was arrested, June 22, 2001, detectives Barnes and Joseph interviewed him about the assault on Mason. As the interview progressed, the detectives began to suspect that Jackson was at times referring to Myers. A recording of the interview was played for the jury.

Barnes began the interview by explaining that they were investigating an assault that occurred up the street from where Jackson was staying and that items of Mason's property had been found in his possession. Jackson denied that Forston was involved and stated that his "homeboys" Mark Johnson, "Psycho Bullet," and "Tom Dog" gave him the television through his window. He said the three men had "pecked" on his window after he and Fortson had gone to sleep, asked him for the $15 he had borrowed earlier from his neighbor, and slipped the television through the window. He acknowledged that the television was stolen, but denied knowing anything about the theft.

Jackson stated that the three men had given him a gun along with the television. When asked where the gun was, he first said that he had thrown it into the trash and later said they had come back to get it. He did not otherwise mention the gun during the interview. When asked about the checkbook found in Fortson's purse, he said that it came through the window in a box along with the television and the gun. When asked where the box was, he said that he had taken his medication before the men came and was too tired to pay attention to what was going on.

14

Jackson stated that he takes Haldol and Cogentin. He said he knew his friends were going to break into a house, but he did not do anything to stop it. He said that he was struggling to remember what happened because he had taken his medication and drank beer that night. Eventually, he said that he remembered carrying the television set. He said he "knew he did somethin' bad" and was "tryin' to think of a story." He said he had gone for a walk that night to think about his problems. He saw a garage door that was open and he went in to hide. The owner shut the door, locking him inside, which made him feel scared.

Barnes asked Jackson what he did inside the house. Jackson said he made a sandwich and drank some water at the sink. He said he initially thought no one was home, but was startled when an older woman with red hair "came out of nowhere." The woman did not look old to him. He "just flipped" and punched her in the face. He wanted to leave, but could not get out because the doors were locked from the inside. He left through a window. He did not remember taking the woman's purse, but thought he had taken her checkbook on his way out. He said he had made up the friends on whom he initially blamed the theft of the television.

After further discussion, Jackson said he thought he carried the woman to her car. He placed the woman in the passenger seat, drove onto the freeway, and threw her out the car window by the hair. He walked home and, by the time he woke up, had forgotten about the television. When the police arrived, he wondered what he had done. He asked the detectives whether he had killed the woman when he threw her out of the car. He remembered driving past a Jack in the Box and tossing her body out of the car before he reached Victorville, at a spot called "the View." The spot was up in the mountains near a big white church. He described the woman's car as a grey Audi.

15

Barnes asked if he could be confusing two situations and Jackson said he did not think he was. Barnes asked if Jackson remembered ripping the woman's clothes off and raping her, and Jackson said no. Barnes brought up the fact that there had been a similar incident in the neighborhood recently and Jackson said, "I didn't do it." Jackson said he was positive because he remembered hearing about the details of the earlier incident from his mother. The detectives asked if he could remember any details of the sexual assault on Mason. Jackson said he could remember "stabbing her in the back" with a "long machete knife." When asked if he was having a flashback to a different event, he said, "I think all this was like the same lady, the same lady I seen in the house is the same, the same lady with the red hair and that's all, that's it, that's all I know." Riverside Police Sergeant Steven Johnson testified that there were no other cases in 2000 or 2001 in Riverside with fact patterns that matched Jackson's statements to police, i.e., cases in which an elderly woman was stabbed, taken somewhere in her car, and then dumped on the road.

The detectives asked Jackson if he would ride with them toward Victorville to indicate where he left the body and he agreed. We take judicial notice of the fact that Victorville, the town near where Jackson indicated he left a body, is on the route between Riverside, where Myers lived, and Las Vegas, where her car was found. (*South Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 715, 744–745 [courts may take judicial notice of matters of common knowledge, including official maps].) Myers's body was never found.

i. June 25, 2001 Dog Trailing

Barnes, Johnson, Webb, and Police Officer Tina Banfill Gould testified regarding dog trailing conducted at the Orange Street police station on June 25, 2001, to test whether Jackson's scent could be linked to Myers's disappearance.

16

Police chose the location because Jackson had not been there before. To lay the trail, Jackson was led through the station by Barnes and Johnson from the entrance, around at least two corners, and into a men's locker room. The detectives sat Jackson on a bench, closed the door, and stayed in the room with him. They were dressed in casual clothing, while Jackson was wearing an orange jail jumpsuit.

Webb presented Maggie with a crumpled manila envelope, which had been found on Myers's bed on May 15, 2001. It took Maggie 10 to 15 minutes to trail from the starting point, around both corners that Jackson had turned, to the locker room. When Webb opened the locker room door, Maggie walked past the detectives, walked down the row where Jackson was seated, and put her paws on the bench and her head next to his chest. Webb testified that this indicated that Jackson's scent was on the manila envelope.

In addition to Webb, the prosecution called two expert witnesses, Dr. Lisa Harvey and State Trooper Douglas Lowry, to testify about the use of dog trailing. Their testimony is discussed further below. (*Post*, at pp. 41–44.)

2. Defense Evidence

The defense called Dr. Lawrence Myers, a professor at the Auburn University College of Veterinary Medicine and an expert on detector dogs, who testified about the reliability of dog trailing. Dr. Myers disputed Dr. Harvey's opinion regarding how accurately an experienced dog can discriminate among and follow human scents. His testimony is discussed further below. (*Post*, at pp. 44–46.)

Detectives Sutton and Barnes testified that, on the afternoon of June 22, 2001, they drove with Jackson to the area he described as the View to try to find Myers's body. A handful of detectives and a trained dog searched an area of

17

multiple acres for several hours. They did not find the body. A few days later, another search was conducted near Victorville, but nothing was found.

Barnes testified that, when he interviewed Fortson at the Spruce Street station on June 22, 2001, she told him that Jackson spent the night with her on Mother's Day, that they had sex, and that she cooked breakfast for both of them the next morning.

Billie Harris testified that, during the day of May 13, 2001, Fortson and Jackson borrowed her car for about two hours. This was the only occasion on which she permitted them to do so. She did not recall whether she saw Jackson the following day, but, from the time Fortson came to live with her in March until the time Jackson was arrested, neither Fortson nor Jackson was ever gone overnight.

Zubevi Khalfani, Harris's grandson, testified that he would visit Harris several times per month. During his visits, he would lift weights with Jackson and Richard Shrader. On cross-examination, he stated that the last time he could recall lifting weights with them was on Mother's Day 2001. That day, Khalfani was at Harris's house until 5:00 p.m. and did not remember Jackson leaving the house while he was there.

Jackson's father, Bailey Jackson, Sr., testified that he drove a Greyhound bus route to Las Vegas prior to his retirement, but that he had last worked on March 30, 2001. Greyhound district manager Edward Bauer produced employment records showing that Jackson, Sr., worked on June 21 and 24, 2001, but on no other day in May or June.

Regarding the newspaper clipping found in Jackson's parents' home, Jackson, Sr., testified that the cabinet contained items belonging to him and his wife, not to Jackson, and that his son did not have a key to the cabinet. Jackson,

18

Sr., frequently kept newspaper clippings about unsolved crimes in case he came across information that could be helpful.

## B. Penalty Phase

### 1. Evidence in Aggravation

During the penalty phase retrial, the prosecution reintroduced much of the guilt phase testimony.

In February 2005, at the prosecution's request, Dr. Harvey ran two additional dog trails at the San Bernardino police station, using her own dogs to try to match Jackson's scent to a scent pad that had been placed in the envelope found on Myers's bed. This trailing is discussed further below. (*Post*, at pp. 111–115.)

Barnes testified that, on June 22, 2001, he had a recorded conversation with Jackson while driving to the View to attempt to locate Myers's body. The conversation, a transcript of which was admitted into evidence, ran as follows:

"BARNES:   Hey when you, the times you were in the joint, did you guys talk about, about, you guys cleaning evidence, like cleaning crime scenes, what not, you know, that shop talk, you know about cleaning up . . . after you did somebody? You guys ever talk about that?

"JACKSON: No. . . . .

"BARNES:   What are some of the common ways? That you know.

"JACKSON:  Like, like meaning what?

"BARNES:   Like, like whacking somebody.

"JACKSON: Kill somebody?

"BARNES:   Yeah.

"JACKSON: You got to get rid of the body. . . .

19

"[DETECTIVE] JOSEPH:  What did you use to clean, what did they use [*sic*] clean up with?

"JACKSON: I don't know.  They just usually them like one dude told me they go in with a jump suit on just regular clothes underneath and have on gloves and all that stuff. . . .

"BARNES:   What would they put down to like cover up blood?

"JACKSON: Cover up blood?

"BARNES:   Yeah. . . .

"JOSEPH:    How you cleaned it up.

"JACKSON: I, I would, I would throw some Clorox on it. . . .

"BARNES:   Clorox bleach stuff.

"JACKSON: [Uh huh.]

"BARNES:   How did you know that?

"JACKSON: Huh?

"BARNES:   How did you know that?

"JACKSON: I just, just thought of it."

The prosecution introduced victim impact testimony from Myers's sons, Douglas and William, and from her granddaughter, Deanna.  They testified about the pain and frustration of not knowing where Myers was or what had happened to her.

The prosecution introduced evidence that Jackson had committed prior crimes, as found true by the guilt phase jury:  robbery, aggravated robbery, attempted possession of a stolen vehicle, second degree burglary, infliction of serious bodily injury, and petty theft with a prior.

20

2. Evidence in Mitigation

Dr. Myers testified regarding the reliability of dog trailing evidence. In addition to the opinions he offered during the guilt phase, he opined that the February 2005 trails were unreliable because the procedure used allowed for Dr. Harvey to inadvertently cue the dogs. He stated that the fact that the dogs engaged in trailing was not sufficient, absent a conclusive alert at the end of the trail, to infer that they had matched Jackson's scent to any scent on the envelope.

Jackson's family members testified about the childhood abuse that Jackson's mother, Cleona, had inflicted on him and his siblings. Cleona regularly berated her children, including Jackson, and beat them with a belt. Jackson's brother Larry recalled being beaten and tortured, having his hand held over an open flame on the stove, and being hospitalized once when Cleona threw boiling water on him. Jackson's sister Dolores testified that Cleona struck her in the arm with a pipe, causing permanent nerve damage, and threw scissors at her. She also testified to having seen Cleona throw Jackson as an infant against a couch and yell repeatedly at him to shut up. Cleona also made her sons, including Jackson, beat Dolores. Cleona taught her children to shoplift and used them to steal food from the store or from other people.

## II. DISCUSSION

### A. Pretrial Issues

1. Severance

Jackson contends that the trial court committed reversible error in denying his motion to sever the Mason counts from the Myers counts.

a. Background

Jackson moved before trial to sever the Myers charges from the Mason charges. He argued that the evidence relevant to each incident was not cross-admissible because the incidents were not sufficiently similar. He argued that

21

evidence of the "brutal cross-racial sexual offense" against Mason would "overwhelm[]" the jury and prejudice the verdict on the weaker capital murder charge. He contended that there was no physical evidence linking him to Myers's disappearance and "no description of other evidence as to who the perpetrator might be," leaving the prosecutor with "some equivocal statements, assuming admissibility[,] and his proximity to the homicide." Finally, he argued that few benefits would flow from joinder because there was only minimal overlap between the evidence and the legal issues relevant to each incident.

The trial court denied Jackson's severance motion. "[T]hese are not two completely unrelated events. Where we have a murder and then several weeks later we have a rape, and there's no cross admissibility of the evidence. And under 954, joining them together, because they are both assaultive crimes. That's not what we have. [¶] We have, again, the confession of the defendant — or I should say the admission of the defendant anchor [*sic*] both counts. And this body of evidence would be admissible whether we were trying the 187, or trying the attempt 187 and sexual assault. This evidence is probative. It's highly relevant. [¶] Is it prejudicial? Yes, it is. Very prejudicial. We often say any evidence that is relevant and probative is certainly prejudicial to the defendant if it tends to show guilt. This is very prejudicial evidence. But on the other hand, it's highly probative and relevant to the fact-finder."

b. Analysis

Section 954 authorizes the joinder of two or more criminal charges, so long as the offenses are "connected together in their commission" or "of the same class." Because murder and rape "are assaultive crimes against the person," they constitute "offenses of the same class of crimes" under section 954. (*People v. Ramirez* (2006) 39 Cal.4th 398, 439.) When charges are properly joined under

22

section 954, a defendant must make a "clear showing of prejudice" in order to establish that a trial court's denial of a motion for severance was an abuse of discretion. (*People v. Lucas* (2014) 60 Cal.4th 153, 214 (*Lucas*).) Because the " 'state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of' evidence" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221 (*Alcala*)), "a party seeking severance must make a stronger showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial" (*People v. Arias* (1996) 13 Cal.4th 92, 127 (*Arias*)).

Our framework for analyzing prejudice in this context is well established. "Cross-admissibility is the crucial factor affecting prejudice. [Citations.] If evidence of one crime would be admissible in a separate trial of the other crime, prejudice is usually dispelled." (*People v. Stitely* (2005) 35 Cal.4th 514, 531–532 (*Stitely*).) "If we determine that evidence underlying properly joined charges would *not* be cross-admissible, we proceed to consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' " (*People v. Soper* (2009) 45 Cal.4th 759, 775 (*Soper*).) Three factors are most relevant to this assessment: "(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense. . . ." (*Ibid.*)

We conclude that the trial court, in the light of " 'the record . . . when it made its ruling' " (*Soper*, *supra*, 45 Cal.4th at p. 774), did not abuse its discretion when it denied Jackson's motion to sever the Mason case from the Myers case.

The Mason sex crimes evidence was fully cross-admissible, and even if it was not, the joinder satisfied the relevant factors. Furthermore, Jackson has not met his burden of showing that "joinder actually resulted in 'gross unfairness,' amounting to a denial of due process." (*Arias*, *supra*, 13 Cal.4th at p. 127.)

Evidence Code section 1101, subdivision (a) sets forth the " 'strongly entrenched' " rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion. (4 Leonard, The New Wigmore: Evidence of Other Misconduct and Similar Events (2014) § 1.2, at p. 2; see *People v. Villatoro* (2012) 54 Cal.4th 1152, 1171 (*Villatoro*) [rule against propensity evidence "is at least three centuries old in the common law"].) " 'The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.' [Citation.]" (*Villatoro*, at pp. 1171–1172.)

At the same time, "other crimes" evidence is admissible under Evidence Code section 1101, subdivision (b) "when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes." (*Lucas*, *supra*, 60 Cal.4th at pp. 214–215.) In this inquiry, the degree of similarity of criminal acts is often a key factor, and "there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: 'The least degree of similarity . . . is required in order to prove intent . . . .' By contrast, a higher degree of similarity is

required to prove common design or plan, and the highest degree of similarity is required to prove identity." (*Soper*, *supra*, 45 Cal.4th at p. 776, italics omitted.)

In the light of the record before the trial court at the time it made its ruling, the trial court did not abuse its discretion in denying Jackson's motion to sever the charges. As Jackson's counsel pointed out during the severance hearing, both the Mason and Myers charges involved crimes against petite elderly women who lived alone in the same neighborhood where Jackson was staying, who were attacked six weeks apart in their homes late at night, and who were robbed of a small amount of property, without their homes being ransacked.

The trial court had before it Jackson's June 22, 2001 statements to the police that implicated him in both crimes. As the trial court explained, initially the police were not focused on the Myers crime during the June 2001 interview. Thus, had the charges been severed, the entire statement would be admissible in a trial on the Myers case because the jury would need to know certain background facts about the Mason incident in order to understand Jackson's interview statements as evidence of his guilt on the Myers charges. For example, without knowing that Mason did not have red hair and that Myers did, the jury would not understand why the detectives believed Jackson was referring to Myers when he mentioned a woman with red hair. Likewise, without knowing that Mason was strangled in her house and left in her bed, the jury would not understand why Jackson's description of stabbing a woman and throwing her out of a car window suggested he was talking about Myers as opposed to Mason.

As the trial court reasoned: "I think the big key here . . . is the defendant's confession. [¶] If the Court severed these counts and you proceeded first, let's say on the 187 count [Myers], let's say, as the trial judge, I would allow the confession in its total circumstance. And then the People would be able to introduce evidence that the defendant was making willfully false and misleading statements to the

25

police by bringing in the testimony of Myrna Mason." The court reiterated that "if this was just one count of 187 against Miss Myers, that entire confession would come in. You can't separate it because it is so bound up and intertwined with everything. And then the People have the right to introduce evidence that he was making a false and misleading statement to the police, and bring in impeachment evidence from the Myrna Mason robbery, rape and attempted murder. So regardless of which count was being tried, the whole thing would come in. [¶] That's the key here. It's not only cross admissibility of evidence, it's the pivotal evidence which anchors both counts."

The most salient evidence of the Mason crimes known to the court at the time it made its ruling — and the principal linkage that the prosecution sought to draw between the Mason and Myers crimes — had to do with Jackson's torturous rape of Mason. We thus train our attention on whether the trial court correctly ruled that the evidence of the sex crimes against Mason would be admissible in a separate trial of the Myers charges. If so, the trial court did not abuse its discretion when it denied Jackson's pretrial severance motion. We find that the Mason sex crimes evidence would have been admissible in a separate trial of the Myers charges for the purpose of proving intent and common plan.

### i. Intent

For cross-admissibility of evidence based on common intent, " '[t]he least degree of similarity . . . is required . . . . [T]he . . . misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same [noninnocent] intent in each instance.' [Citations.]" [Citation.]' " (*Alcala*, *supra*, 43 Cal.4th at pp. 1222–1223.) "[T]he similarity required in order to prove the existence of a common scheme or plan, applies all the more to the use . . . of other

26

charged crimes in order to prove intent — which, as noted, requires an even lesser degree of similarity among the offenses." (*Id.* at p. 1226.)

In *Alcala*, the defendant was charged with five murders, one in Orange County and four in Los Angeles County. In finding the evidence of the Los Angeles murders cross-admissible to show common plan and intent to murder in the Orange County case, we noted the similarities between the cases: "Each of the victims was a young, single Caucasian female; all of the homicides involved blunt-force facial trauma and occurred within a 19 month period; and the bodies of all of the victims were discovered unclothed, or nude from the waist down. In addition, all of the offenses appear to involve a sexually sadistic motive." (*Alcala*, *supra*, 43 Cal.4th at p. 1224.) Although the incidents also differed in certain respects (including age, location of the bodies, evidence of sexual assault, and the positioning of the bodies), we determined that the similarities met the standard to support an inference of intent. (*Id.* at p. 1226 ["the evidence underlying the four Los Angeles County charges would be relevant at a separate retrial of the [Orange County] case to demonstrate the mental states of premeditation and deliberation required for murder"].)

In *Stitely*, we found cross-admissibility on a theory of common intent where one victim was raped and the other murdered. (*Stitely*, *supra*, 35 Cal.4th at p. 532.) The prosecution introduced evidence that the defendant choked and raped one victim to show that he acted with "similar criminal intent" when he had sexual intercourse with the other victim, who was choked to death. (*Ibid.*) We held that "[t]he chance that defendant acted with innocent intent with [the murder victim] is sharply reduced by evidence that he committed a forcible, nonconsensual sex act upon [the rape victim] a few months earlier." (*Ibid.*)

In this case, the similarities between the two incidents suggest a common intent. As noted, in both incidents the victims' homes were not ransacked,

27

minimal property was taken, and in the Myers case her dress was found on the floor of the guest room. Thus, the evidence that Jackson burglarized Mason's home and viciously attacked and raped her supported an inference that he had harbored the same intent toward Myers, who was another elderly woman living alone in the same neighborhood.

ii. Common plan

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*); see *ibid.* ["evidence that the defendant has committed . . . criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the [other] acts"]; *People v. Catlin* (2001) 26 Cal.4th 81, 111 (*Catlin*) ["evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations' "].)

Our case law has found cross-admissible evidence of a common plan in a variety of circumstances: where the sexual molestation victims were the defendant's resident stepchildren and were molested by the defendant when they were of a similar age (*Ewoldt*, *supra*, 7 Cal.4th at p. 403); where both victims were the defendant's close relatives and both had been poisoned with a rare substance (*Catlin*, *supra*, 26 Cal.4th at p. 111); where "[e]ach [crime] involved the robbery of a woman alone in an office, and each involved a violent confrontation," even though two of the incidents involved sexual assault and one did not (*People v.*

28

*Foster* (2010) 50 Cal.4th 1301, 1330); and where all three offenses took place in the same geographic area, occurred within one month of each other, and involved home invasion robberies in which the victims' cars were taken, and where two of the offenses were carried out in the victim's garages by men with ski masks who asked similar questions of the victims (*People v. Capistrano* (2014) 59 Cal.4th 830, 849 (*Capistrano*)).

In *People v. Kraft* (2000) 23 Cal.4th 978, 1002–1021, 1031–1032 (*Kraft*), we found cross-admissibility of evidence of 16 murders based on a common plan even though the crimes varied in geographic location and other details. "The victims shared certain characteristics, all being White males between the ages of 18 and 25, all but one being single, and most being, at the time of the offense, vulnerable by virtue of lack of transportation. The method of obtaining control over the victims was similar in most of the charged offenses: Defendant generally supplied the victims with alcohol and drugs, often diazepam, to the point they could no longer resist, whereupon defendant generally bound their wrists with ligatures, frequently using shoelaces. After gaining control over the victims in such a manner, unless they were already succumbing from the effects of the drugs, defendant killed them, often by ligature strangulation. After the victims' deaths, defendant disposed of the bodies generally by dumping them from his car, usually on or near a freeway or other roadway. And each murder involved some type of arguably sexual activity or aberration, whether taking the form of sodomy, mutilation or stripping the victim of clothing." (*Id.* at p. 1031.) The court noted that even though the crimes were not committed in an identical way, "a lesser degree of similarity is necessary to admit evidence of other offenses to prove a common design or plan than to prove identity." (*Id.* at pp. 1031–1032.)

We also found cross-admissibility under a theory of common plan in *People v. Marshall* (1997) 15 Cal.4th 1 (*Marshall*), where the defendant was

charged with a capital murder and a prior attempted assault. Cross-admissibility was established in part based on close geographic and temporal proximity as well as the identity of actions threatened or carried out on the victims: "Durneall H. was attacked in the same area as Sharon Rawls one month before Rawls was killed. During the attack on H., she was dragged towards the same abandoned apartment building in which Rawls's body was later found. H. was strangled, so was Rawls. H. was told by her attacker that he intended to rape and kill her; there was evidence that the attack on Rawls too was sexually motivated. A bus pass belonging to H. and taken from her during the attack was found in defendant's room; a letter belonging to Rawls was found in defendant's possession when police detained him as he was leaving the building where Rawls's body was found." (*Id.* at p. 27.)

In this case, several similarities between the Mason incident and the Myers incident suggest a general plan or method of operation. The victims were both elderly women who lived alone, making them vulnerable to attack. The victims lived near each other in the same neighborhood as Jackson. Each had briefly gone outside her home late on the evening of the attacks. Both victims' homes were burglarized late at night after the women had been outside. In both incidents, only small amounts of property were taken, and neither home was ransacked. In both incidents, there was evidence of sexual assault. The dress found on the floor in the guest room of Myers's home supported the inference that she did not disrobe on her own volition but rather was forced to undress. Jackson's own conflation of the two crimes in his police interview further supports the inference that Jackson attacked Myers in the same way he attacked Mason.

These points of similarity suggest that Jackson had a common plan of attacking elderly women late at night while they were alone in their homes in his neighborhood, with the purpose of sexually assaulting them. The evidence that

30

Mason was viciously raped would have been admissible in a separate trial on Myers's murder because it was probative of a common plan.

In sum, we hold that the evidence of Mason's rape was fully cross-admissible in the Myers case to prove common plan and intent. The two crimes were committed within a short span of time in close physical proximity against two elderly women who lived alone. In both cases, the victim's home was burglarized late at night but was not ransacked; only a small amount of property was taken, and there was evidence of sexual assault. "If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Soper*, *supra*, 45 Cal.4th at pp. 774–775; see *Kraft*, *supra*, 23 Cal.4th at p. 1030.)

Jackson argues that although cross-admissibility normally dispels any suggestion of prejudice, his case is an exception. We disagree. While evidence of the torturous attack and rape of Mason was likely to inflame the jury, so too was the evidence that Jackson attacked Myers, an elderly woman, late at night, sexually assaulted her, possibly stabbed her to death, and disposed of her body in a place where it would never be found. In addition, the Myers case was not weak. Jackson's own statements, the recovery of Myers's car in Las Vegas, the shoe prints in her home matching shoes similar to those he wore, and the dog trailing evidence strongly suggested his guilt. Finally, although the Myers case was a capital offense, " 'consolidation may be upheld on appeal where the evidence on each of the joined charges is so strong that consolidation is unlikely to have affected the verdict.' " (*Arias*, *supra*, 13 Cal.4th at p. 130, fn. 11.) Accordingly, we find that the trial court did not abuse its discretion in denying Jackson's severance motion.

31

Even if the trial court's ruling was correct when made, we must reverse if Jackson shows that "joinder actually resulted in 'gross unfairness,' amounting to a denial of due process." (*Arias*, *supra*, 13 Cal.4th at p. 127.) In addressing this issue, we bring into focus the sex crimes evidence and how the prosecution used this evidence to incriminate Jackson on the Myers charges. Significant stretches of the trial were dedicated to detailed evidence of Jackson's rape of Mason.

The trial began with Officer Soto's testimony that on June 22, 2001, he responded to a call concerning the "rape of an elderly woman." The prosecution played a recording of Mason's 911 call in which she told the dispatcher, "I've just been raped." After the tape was played, Officer Soto gave further testimony regarding Mason's description of the attack, stating that the perpetrator "threatened to rape her vaginally and anally, but she had the presence of mind to tell him that he probably wouldn't enjoy it because she had most of her organs removed."

The next witness was Patricia Forst, the nurse who examined Mason at the hospital. Forst testified that her clinical forensic examination of Mason took 17 hours, the longest examination of a sexual assault victim that she had ever performed in seven years as a registered nurse. Forst described, among other things, lacerations in Mason's vagina that were actively bleeding at 3:30 in the afternoon, over 12 hours after the assault, and bruising on Mason's tongue consistent with choking or having an object jammed in her mouth. Forst also stated that Mason was in too much pain to undergo a pelvic exam without general anesthesia, which is not typically used for that procedure.

Detective Joseph testified about his interview with Mason in the hospital. The prosecution played a tape of the interview, during which the jury heard Mason describe the incident in detail in her own voice. The interview lasted an hour. Mason's statements to Joseph tracked the account she gave at the preliminary

32

hearing, and she recounted each brutal fact of the assault in the most polite language she could manage. She said that when she woke up, there were "big spots about salad plate size of blood [] from each ear." When she reached down and touched the rake handle, she thought at first that it was "a figment of my imagination," but then she pulled on it and "it kept coming out and kept coming out and kept coming out, I wasn't pulling very hard because didn't [*sic*] know what, how far up it was and how much damage it has, had done but uh, uh it seemed like it was forever before it finally was out." Mason's account of the violence she suffered was interspersed with details of her everyday life: she "rake[d] the pine needles out where a lawn should be"; she watched *Wise Guy* while she ate her television dinner; her wooden television stand was made for her by "the nicest neighbor ever anyone could want, he's a retired school teacher and taught uh Wood Shop." As recounted by Mason, the rape occurred during an otherwise ordinary night at home.

The prosecutor introduced several photographs of the rake, including a close-up of the handle. He asked Ellis, the senior evidence technician, to point out the "reddish stain" on the end of the rake handle, which Ellis testified appeared to be blood.

Two weeks later, the prosecution had the 70-page transcript of Mason's preliminary hearing testimony read to the jury.

At closing argument, the prosecutor explained how he thought the evidence of the Mason rape was crucial to understanding what happened to Myers: "Evidence of what the defendant did to Myrna Mason is undisputed. . . . [T]he proof of the defendant's identity as the perpetrator of the attack on Myrna Mason is without question. [¶] In comparison, the proof of the defendant's identity as the perpetrator of the crimes against Geraldine Myers is not as clear. But it is no less convincing when you examine the entirety of the evidence." In framing his

argument, the prosecutor urged the jury to reason from the Mason evidence to Jackson's guilt of the Myers charges: "Begin your analysis of the evidence in this case with the crimes that occurred on June 22nd, 2001, the crimes against Myrna Mason. Because it's the details of the commission of those crimes, the defendant's conduct in the commission of those crimes and afterwards, the evidence that was collected during the investigation of those crimes, and the defendant's statements when he was being question[ed] about those crimes that prove beyond a reasonable doubt that he is also the one who viciously attacked and murdered Geraldine Myers on May 13th, 2001." After reviewing the Mason evidence, the prosecutor turned to the Myers murder and drew comparisons to the Mason crimes. In particular, the prosecutor said: "Neither place was ransacked. Not Myrna Mason's, not Geraldine Myers's. And that tells you something. The person who attacked Gerry Myers, like the person who attacked Myrna Mason, their primary motivation wasn't theft. . . . The primary motivation was something else: violent, vicious sexual assault." The prosecutor noted that the perpetrator did not take all of Myers's valuables, that a dress Myers had been wearing that day was left on a bedroom floor, and that bleach had been used on the hallway carpet. The prosecutor then said: "Why do you think the defendant had to dispose of Gerry Myers's body? The rational conclusion is not to cover up a theft; to cover up a rape. He knew his DNA was in her body and that's why he had to get rid of her body and dispose of it. Otherwise why not leave her there like Myrna Mason? He knew he hasn't [*sic*] ejaculated in Myrna Mason. He could leave a message with that body. [¶] But Gerry Myers, the first one, was different. We had a drop of her blood found on that heater vent analyzed. . . . [¶] Again, this isn't a lot of blood for someone who has been violently murdered, suggesting she didn't bleed a lot from the manner in which she was killed, which suggests that it wasn't a stabbing like the defendant indicated in his statement but more than likely, based

34

upon all the evidence that you have, she was strangled just like Myrna Mason during the vicious, violent sexual assault that was his primary motivation."

The prosecutor later argued that "the similarities to the way in which you find Gerry Myers's house are haunting when you look at what happened with Myrna Mason, and the similarities are undeniable. And they are similar because they were perpetrated in an identical manner by the identical person, Bailey Jackson." In closing rebuttal, the prosecutor said, "The one thing you have to recognize, the one thing that's clear in this case, what that man's capable of, we know, what he did to Myrna Mason. When you put that together with all of the circumstantial and physical evidence, including his scent on that envelope at the scene of Gerry Myers's house, there is no doubt that he is the one that committed that crime."

The Mason sex crimes evidence, as presented above, was prejudicial in that it tended to show that Jackson was guilty of the Myers murder. But that does not mean joinder of the charges resulted in a grossly unfair trial. There was sufficient independent evidence of guilt against Jackson for Myers's murder without evidence of the Mason sex crimes: the matching shoe print evidence; the dog trailing evidence; the physical and geographic similarities between the two victims and their residences; the similar circumstances of the two crimes; and Jackson's own statements all strongly implicated Jackson as guilty of Myers's murder. Thus, there is not a strong likelihood that without the evidence of the Mason sex crimes, Jackson would have escaped a guilty verdict in the Myers case.

Accordingly, we conclude that joinder of the Mason and Myers charges did not result in gross unfairness amounting to a denial of due process.

35

2. Dog Trailing Evidence

Jackson contends that the trial court erred by admitting dog trailing evidence without holding a hearing under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) or Evidence Code section 402.  He argues that the admission of this evidence violated his Fifth and Sixth Amendment rights.  We conclude that the evidence was properly admitted at both the guilt and penalty phases.

a.  Background

i.  Uses of Dog Trailing in This Case

Dog trailing was used four times during the investigation of this case.  The first time was in the early morning of June 22, 2001.  Coby Webb, a deputy sheriff in the Riverside County Sheriff's department, and her police dog, Maggie Mae, a bloodhound, were called to Mason's house.  Webb used a handheld device called a scent transfer unit to vacuum scent from a fresh shoe print outside the house and transfer it to a gauze pad that she presented to Maggie.  Maggie trailed across the street and circled a garbage can, which was found to contain Mason's purse.  She then trailed down the street, walked onto the Shraders' porch, walked off, and went over to the Harris residence, where Jackson was staying with Fortson. Maggie sniffed around for "quite a bit" in the area between the two houses, until Webb thought she was confused and brought her back to the garbage can to start over.  From the garbage can, Maggie trailed down the street past the Harris residence and then appeared to have lost the scent.

The second instance occurred later the same morning when Webb and Maggie were called to the Spruce Street police station.  Webb was asked to "trail or eliminate" someone being held as a suspect.  Webb was told that the suspect was in the building and had been in the lobby, but not which path he had taken from that spot.  Webb presented Maggie with the same scent pad she had used earlier in the morning and Maggie began to trail through the building.  Maggie

36

walked into an interview room, came out, walked into a different interview room where Jackson was sitting, and stopped in front of him. Webb testified that Maggie did not "commit herself to jump up on" Jackson, but stood still in front of him.

The third instance occurred on June 25, 2001, at the Orange Street police station. To lay the trail, Jackson was walked from the street entrance, through the building around at least two corners, and into a men's locker room. Detectives Barnes and Johnson sat Jackson on a bench, closed the door, and then remained in the room with him. The detectives wore casual attire, while Jackson, the only Black man in the room, wore handcuffs and an orange jail jumpsuit. On the sidewalk outside the station, Maggie was presented with the crumpled manila envelope that had been found on Myers's bed on May 15, 2001. The envelope had been collected by criminalist Mark Traughber, who placed a sterile gauze scent pad inside it for 15 minutes to collect any human scent that was left on it. The envelope was then placed inside a different manila envelope and the gauze pad was placed in a Ziploc bag. Both were taken to the Spruce Street station. On May 16, 2001, evidence technician Ellis treated the envelope with a ninhydrin solution to test for latent fingerprints, and then placed it in a sealed evidence bag. (Ninhydrin is a chemical "that detects fingerprints by staining them a color ranging from a light pink to a dark purple." (*Lucas*, *supra*, 60 Cal.4th at p. 179.) The solution Ellis used contained ether acetate, ether ninhydrin, and xylene.

It took Maggie between 10 and 15 minutes to trail from the starting point outside the station to the locker room door, following the exact path that Jackson had taken. When Webb opened the door, Maggie went past both the detectives and proceeded to the row of lockers where Jackson was seated. Webb lost sight of Maggie when the dog turned the corner to walk down Jackson's row. When Webb

37

reached the row where Maggie had turned, she saw Maggie jump into Jackson's lap.

The fourth instance took place in February 2005, between the two penalty phase trials. The pertinent facts are set forth further below in the context of Jackson's penalty phase claims. (*Post*, at pp. 111–115.)

> ii. Motion for a Hearing Pursuant to *Kelly* or Evidence Code Section 402

Before trial, Jackson moved the court to hold a hearing pursuant to *Kelly*, *supra*, 17 Cal.3d 24, and Evidence Code section 402 before admitting evidence of the June 25, 2001 dog trailing. Jackson submitted law review articles, scientific publications, a declaration from Dr. Lawrence Myers, a professor of animal behavior and sensory physiology and medicine at Auburn University College of Veterinary Medicine, all calling into question the reliability of using dogs to identify people by scent.

The prosecution, citing *People v. Craig* (1978) 86 Cal.App.3d 905 (*Craig*), argued that *Kelly* did not apply because Webb used a "[t]raditional tracking technique[]" that had "long been recognized in the law." At the hearing on Jackson's motion, the prosecution further argued that *Kelly* was inapposite because dog trailing is not a scientific technique but a matter of common cultural knowledge: "It's something that's been recognized in the real world over the centuries as an ability that dogs have. And man has been successful at times in capturing that ability and utilizing it. It's not something that's foreign to a jury's understanding. They can apply their own common sense. Jurors have been exposed to bloodhounds tracking inmates in movies and in books and such dating back to I think the time that movies were first created. They are aware that dogs have this ability."

Citing *People v. Malgren* (1983) 139 Cal.App.3d 234 (*Malgren*), the trial court found that the June 25, 2001 procedure was "[m]ore appropriately one of tracking" and thus admissible without a *Kelly* hearing.  The court found that the "fact that this was in a controlled atmosphere and the officers knowing the path that the defendant actually took through the police department and the testimony that the dog actually followed that path identically I think is strong circumstantial evidence that the dog was on the proper scent."  The court held that the evidence was admissible without a hearing under either *Kelly*, *supra*, 17 Cal.3d 24, or Evidence Code section 402.

iii.  Expert Testimony

(a) Deputy Coby Webb

Webb testified that she began bloodhound handler training in November 1998.  She was certified as a trailing instructor by the Canine Training Academy in September 2001 and is a member of the Law Enforcement Bloodhound Association.  Webb got Maggie, her second police dog, in 1999.  Maggie completed 20 hours of training at a Southern California Bloodhound Handlers Coalition Seminar in July 1999 when she was four months old and she attended the Colorado Canine Training Academy in September 2000, where she was certified to trail human scent.  In April 2001, she completed 40 hours of training through the Law Enforcement Bloodhound Association.  She went back to the Colorado academy in May 2001.  Maggie worked on her first case in September 2000.  Webb's department made Maggie a deputy sheriff in November 2000.  At the time of trial, Maggie was certified by the National Police Bloodhound Association.

Webb testified that she would train with Maggie for 10 to 15 hours each week.  Training consisted of running practice trails laid by a deputy or another willing volunteer.  Practice trails often included decoy trails laid by people Maggie

39

knew in order to teach her to avoid distractions. Maggie would regularly run "negative trails," in which she was presented with an object scented by someone who had not been in the area and was rewarded for *not* trailing. When Maggie could not find a trail matching the scent object, she would respond by walking around in a circle. Some of the practice trails that Maggie would run were blind (that is, Webb would not know the correct path or who the target was). Working with outside organizations, Maggie had also run double-blind trails, where the outside evaluator also did not know the correct path.

Webb testified that there is no standard training for trailing dogs, which is why "people evaluate them on a double-blind where I don't know the trail or the trail layer so that we can make sure that the dog is working." Some training organizations will only "pass" dogs who perform at a certain rate of accuracy; others provide a subjective narrative evaluation of the dog's strengths and areas for improvement. At the time of Jackson's trial, Maggie was one of four dogs in the country in the advanced tracking dog group with the National Police Bloodhound Association.

Webb testified that during training Maggie had been taught to indicate that she had found the person she was trailing by jumping up on them. Webb later testified that it was not necessary for Maggie to jump up on someone to indicate that she had finished trailing. Instead, when Maggie would stop trailing and stand still in front of someone, it was enough for Webb to question that individual to see if "that's the person we are looking for." Webb testified that sometimes when Maggie did not know which of several trails to follow, she would follow the freshest trail.

Webb testified that Maggie had been found to be "reliable" in both training and cases in the field. She described seven cases in which Maggie had successfully trailed a human by their scent before the June 25, 2001 trailing. She

also described challenging tasks that Maggie had performed. In one instance, Maggie followed the scent of someone who wrote a letter that was mailed to Webb and kept in the freezer for four weeks. In another instance, Maggie identified the person who had handled an explosive device by following the scent that remained after the device was detonated. Maggie performed successfully on this task four times out of six and did not falsely alert on the remaining two trials.

With respect to the trail at the Orange Street station, Webb testified that she asked the detectives: " 'Can I please have three turns to make sure Maggie is committed to trailing, and I need to have it where there's no air conditioner on and I don't know where the subject is.' " Although she did not know the path that Jackson took through the basement, she did need to know "where the subject had walked into the building . . . . to match the trail with the scent item or not match, I needed to point [Maggie] on a trail. So I just needed to know where the person first walked into the building." When asked whether the June 22, 2001 trailing would have influenced Maggie on June 25, 2001, Webb stated: "No. We run numerous trails. An example, like this month I believe I'm up to 14 callouts. So I change scents, I mean, almost on a daily basis. And she—I've never seen her able to remember something—a trail of somebody else. I've never, ever seen that."

### (b) Douglas Lowry

Douglas Lowry, a Maryland state trooper and dog handler, testified as an expert witness for the prosecution. He described a trail that he ran at the prosecution's request to determine whether a bloodhound could trail from an article treated with ninhydrin. He had a subject crumple up an envelope and leave it on a bed. After two minutes, the subject placed the envelope in a plastic bag and Lowry brought it to the police station where a forensic technician sprayed it with ninhydrin. The envelope was sealed in a bag used to store evidence and kept in Lowry's basement overnight. The next day, he drove his bloodhound to a public

41

park where the subject and two other individuals laid trails leading away from the parking lot. The subjects started walking abreast and then split off in different directions, crossing one another's paths. Lowry did not watch to see which path each person followed. When Lowry placed the dog at the start of the trail and presented him with the envelope, the dog trailed to the subject who had handled the envelope within 10 minutes. One of the other trail-layers was the dog's primary caregiver, but the dog did not follow her trail.

On cross-examination, Lowry testified that the precise amount of time between when the subject handled the envelope and when the trailing was conducted would not matter so long as the trailing is conducted within a "reasonable time," i.e., not "weeks or months after the envelope was handled." When asked whether he thought his dog would be able to trail off an article 40 days after the subject handled it, he said, "40 days, that's hard for me to say. My theory on working dogs is you really don't know anything until you try your dog. I would say 40 days would really be stretching it for a dog to successfully do that." He agreed that "a scent article left out in the open air with others around . . . in excess of 24 hours would be more likely to be contaminated than an article left out in the open for minutes."

### (c) Dr. Lisa Harvey

Dr. Harvey testified as an expert witness for the prosecution. She testified that bloodhounds can reliably and accurately discriminate between human scents, and that human scent remains on anything that a human touches, including paper.

In the mid-1990s, Dr. Harvey started a research program to study human scent and bloodhound trailing after she found that "there was no research anywhere in the world on how these dogs work." In one experiment, she found evidence that dogs do not follow so-called "rafts" of dead skin cells as some scientists believe, but instead follow a trail of gasses emitted by the human body.

42

In a different study, Dr. Harvey tested dogs' ability to distinguish between identical twins, siblings, and pairs of unrelated people. She concluded that human scent is unique and is determined by DNA, but is not significantly affected by environmental factors such as where someone lives, what they eat, or the personal hygiene products they use. She testified about research conducted by other scientists suggesting that human scent is controlled by chromosome 6, which encodes a part of the immune system referred to as the major histocompatibility complex.

In the summer of 2003, Dr. Harvey published an article in the peer-reviewed Journal of Forensic Sciences. The article describes her first study in the field of dog trailing and human scent, which she undertook because she "went through and looked on the internet to try to . . . see if there were any scientific studies, because we were testifying in court and people were asking us pertinent questions, and I couldn't find them. I didn't know how to answer them appropriately as a scientist. And I was shocked to find that there were no scientific studies. Everything is handed down word of mouth. Nothing is statistically factual, and I was really shocked. So I thought this would be a basic study." She set up multiple blind trails over different types of terrain using multiple trail-layers to determine whether bloodhounds could accurately track the scent of individual humans. The five experienced dogs in the study, all of whom were older than a year-and-a-half, were able to trail accurately 95 percent of the time. The three dogs who were less than a year old were accurate only 60 to 70 percent of the time.

At the time of trial, Dr. Harvey had not published any other articles. She testified that she had conducted other studies on topics including the use of scent transfer devices, the presence of scent in human bodily fluids, the capacity of different materials to retain human scent, the amount of time required to transfer

43

human scent onto an article, and the length of time human scent would persist on an article. She described an ongoing experiment she was conducting in which bloodhounds were able to accurately trail a scent from a T-shirt scrap stored in an evidence envelope for over seven years.

Dr. Harvey testified that there "haven't been any real serious scientific studies" of how bloodhounds are able to trail humans. She stated that she did not know of any other scientists or researchers working on the topic or scientific publications on the use of bloodhounds in "determining human scent."

At the prosecution's request, Dr. Harvey had conducted a test similar to the one Lowry performed to see whether a dog's ability to trail would be impacted by treating a scent article with ninhydrin. She found that the three dogs she tested were able to successfully trail off an envelope treated with ninhydrin; each dog was tested twice. Before each trail, she tested the dog with a scent that was not present in the area to ensure that the dog was not just following a familiar or interesting scent.

Dr. Harvey testified that in order to verify that a dog is accurate and reliable, "we give consistent training to the dog. Then, when we take them to an unknown area trying to trail someone, as long as the dog is working in the same manner that they worked during training, we are able to say that this is consistent; therefore, we say it is reliable." She testified that dogs who are trained to trail human scent will not follow a scent simply because they have been asked to follow that scent on past trails. Instead, dogs are trained to "forget the last smell [they] had when [they] were in harness." She stated that "[b]loodhounds are extremely disobedient dogs," and "only thing we can really get them trained to do is, 'This is my harness. This is when I go out to trail. And when I'm presented with this smell, this is the smell I'm supposed to trail.' "

44

### (d)  Dr. Lawrence Myers

Jackson called Dr. Myers, a professor of veterinary medicine and an expert on detector dogs, to testify.  Dr. Myers stated that human scent is made up of "all of the chemicals that are released by a human."  Scientists have identified many of these chemicals but do not know which chemicals (or combinations of chemicals) dogs rely on to trail humans.  Without this information, Dr. Myers testified, it is hard to determine the reliability of an identification based on an older scent in which certain organic compounds may have degraded or otherwise changed.

Dr. Myers testified that it is accepted that dogs can discriminate between the scents of different people and that they can trail individuals despite the presence of "various contaminations," but the extent of dogs' ability to perform these tasks is unknown because only minimal, inconclusive research has been conducted to date.  Certain components of an individual's scent remain stable over time, but other components are influenced by factors like toiletries, diet, bathing habits, and proximity to smokers and that these variable factors can interfere with a dog's ability to trail.  Training is crucial to ensure that trailing dogs unambiguously understand the nature of the tasks they are asked to perform.

Dr. Myers testified that a properly trained dog that sniffs an article containing human scent will know to follow that human scent.  But if more than one scent is present on an article, there is no way to know which scent the dog is following in a particular case.  He suggested that more research could be done to determine, empirically, how often a dog will follow the desired scent.

Dr. Myers testified that a dog can be cued visually to alert by the fact that only one person in an array is wearing a bright jumpsuit and handcuffs.  He also described how a handler can cue a dog by walking at a different speed, tugging or letting up on the leash, or changing her tone of voice.  He said he would be "very

45

concerned" if the target or decoys in a scent identification task were known to the dog, although he could not say that it would "definitely" affect the outcome.

Dr. Myers also testified about proper evidence handling and storage procedures. Collecting evidence with rubber or latex gloves is imperfect from the standpoint of scent preservation because an individual's scent can pass through the gloves and transfer onto the objects they handle. In addition, people often touch the outside of the gloves when they put them on, transferring their scent in the process. He suggested that the cleanest procedure is to use sterilized metal tongs. The best storage materials are glass, metal, and porcelain. Paper and plastic bags are porous, allowing odors to pass through in both directions. A heat-sealed evidence bag is better than a paper bag, although still porous. Refrigeration, especially at extremely low temperatures, slows scent degradation.

### b. Analysis

#### i. Applicability of *Kelly*

Jackson challenges the trial court's rejection of his request to hold a *Kelly* hearing before admitting evidence of the June 22, 2001 scent trailing. We conclude that a *Kelly* hearing was not required.

*Kelly*, *supra*, 17 Cal.3d 24, renders inadmissible evidence derived from a "new scientific technique" unless the proponent shows that (1) "the technique is generally accepted as reliable in the relevant scientific community"; (2) "the witness testifying about the technique and its application is a properly qualified expert on the subject"; and (3) "the person performing the test in the particular case used correct scientific procedures." (*People v. Bolden* (2002) 29 Cal.4th 515, 544–545 (*Bolden*).) Because our scientific understanding and our understanding of what constitutes "science" is constantly evolving, the term "new scientific

46

technique" resists formal definition. (See *People v. Stoll* (1989) 49 Cal.3d 1136, 1155 (*Stoll*).)

Instead, courts rely on two principles to determine when the test applies. "First, *Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." (*Stoll*, *supra*, 49 Cal.3d at p. 1156; see *People v. Leahy* (1994) 8 Cal.4th 587, 605 (*Leahy*).) To be new, a technique must be meaningfully distinct from existing techniques. (See *People v. Cook* (2007) 40 Cal.4th 1334, 1345 (*Cook*).) Unintentional departures resulting from a careless attempt to follow an otherwise accepted procedure do not implicate *Kelly*. (*Cook*, at p. 1345; *People v. Farmer* (1989) 47 Cal.3d 888, 913, overruled on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.) Second, a *Kelly* hearing may be warranted when "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury." (*Stoll*, *supra*, at p. 1156.)

Appellate courts review de novo the determination that a technique is subject to *Kelly*. (See *Leahy*, *supra*, 8 Cal.4th at pp. 605–607.)

In *Craig*, *supra*, 86 Cal.App.3d 905, the court held that dog trailing — that is, using a dog to find a particular individual by following a trail of their scent (sometimes incorrectly referred to as "tracking") — falls outside the scope of *Kelly* because it is not mechanized but rather the product of individual skill and innate physical ability. "[W]hile the reliability of a machine can be duplicated and passed down the assembly line with relative ease, the abilities and reliability of each dog desired to be used in court must be shown on an individual basis before evidence of that dog's efforts is admissible." (*Craig*, at p. 915.)

The court in *Craig* found that the following testimony from the dog's handler was sufficient to establish reliability: (1) the dog was trained to follow

trails from beginning to end; (2) the dog performed "at the 100 percent level in explosives detection, and work with humans" (*Craig*, *supra*, 86 Cal.App.3d at p. 916); (3) the dog and officer team "rated 100 percent when started from a vehicle"; (4) the dog was tested on a twice-weekly basis; (5) the officer had used the dog in four similar situations prior to this case; and (6) the dog had, "on numerous occasions, followed suspects to a point where the evidence showed the suspects had entered vehicles and driven away." (*Craig*, at p. 917.)

We agree with the analysis in *Craig*. "The *Kelly* test is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate." (*People v. Venegas* (1998) 18 Cal.4th 47, 80 (*Venegas*).) Scent trailing evidence is not so foreign to everyday experience that it would be unusually difficult for jurors to evaluate. Jurors are capable of understanding and evaluating testimony about a particular dog's sensory perceptions, its training, its reliability, the experience and technique of its handler, and its performance in scent trailing, such as performed in this case. (See *Craig*, *supra*, 86 Cal.App.3d at p. 915 ["Therefore, rather than attempt to identify certain specific criteria as being indicative of the ability of dogs, in general, to trail a human, we choose to require each particular dog's ability and reliability be shown on a case-by-case basis. We are not merely assuming a well-trained dog can trail a human; we say that this ability is a fact which, like other facts, may be proven by expert testimony."].)

It is also unlikely that a juror would believe that dogs are scientifically infallible, a risk that *Kelly* was intended to address. (See *People v. Cowan* (2010) 50 Cal.4th 401, 470 (*Cowan*) ["As we have explained, the *Kelly* rule 'is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not.' "].) Jurors can easily understand that even the most well-trained dog can make mistakes. In fact, the

experts called to testify repeatedly conceded this point about trailing dogs in general and Maggie specifically. On cross-examination, Lowry testified that in practice, he observed dogs change their trail from an older scent to a newer scent, and that he observed this more often with newer dogs. He also testified that dogs, like people, have good days and bad days, as well as days when they simply do not want to work.

Likewise, Dr. Harvey, on both direct and cross-examination, testified that the accuracy of dogs was correlated with their age, with "veteran dogs" having a success rate of 95 percent, while novice dogs had a success rate of 60 percent. Dr. Harvey also admitted that even well-trained dogs have good days and bad days. When asked if she thought Maggie made mistakes, Dr. Harvey responded, "Oh, yes, I'm sure." Testifying about her own dog, Shelby, she stated that she could tell "for sure" that Shelby had made mistakes in practices, even if she was not sure of mistakes made out in the field.

Webb also testified that Maggie had previously made mistakes or did not find the target person. She testified that Maggie needs to be continually trained to ignore distractions: "Q. Is Maggie trained in avoiding distractions or ignoring distractions? [¶] A. Well, it's a continuing training. She's a dog. So we have to continually train in ignoring animals and sticking with that one person's scent." She explained that Maggie had sometimes jumped on the wrong person in training and needed to be corrected.

The jury also heard Jackson's expert, Dr. Myers, testify about the fallibility of dogs to trail human scent: "Q. How do we know that the trailing then is accurate and reliable? [¶] A. Right now, you don't. That's really the problem. Um, we have people that are working hard to make it so. We have — I don't think there's any question in anybody's mind that enough research has been done to show that they can do it. The issue is how reliably and under what circumstances

49

can they do it?" Furthermore, when asked whether the ability of dogs to discriminate among human scent was a "generally accepted practice in this research community," Dr. Myers testified, "It's an area of interest in the research community. I would say that most of us, in fact, believe it can be done." The question, Dr. Myers said, is that "we don't know how well it can be done." Thus, even Dr. Myers believed that dog trailing does not raise a question about "a technique, process, or theory which is *new* to science" (*Stoll*, *supra*, 49 Cal.3d at p. 1156) but rather concerns the reliability of a particular dog to consistently trail a given scent and the procedures used in any particular case.

The deviations that Jackson identifies are not sufficient to distinguish this procedure from traditional dog trailing or render it "new" to the law. (See *People v. Cordova* (2015) 62 Cal.4th 104 [holding *Kelly* inapplicable to the latest DNA testing kit, which used the same methodology as earlier kits]; *Stoll*, *supra*, 49 Cal.3d at pp. 1156–1157 [holding *Kelly* inapplicable to psychological methods that were "*not* new to psychology or the law"]); *Cook*, *supra*, 40 Cal.4th at p. 1345 [holding *Kelly* inapplicable to electrophoretic testing of bloodstains (a generally accepted technique) where samples from multiple spots of blood on the same shoe were combined for the purposes of testing]; *Venegas*, *supra*, 18 Cal.4th at pp. 53– 54 [no need to prove general acceptance of restriction fragment length polymorphism (RFLP) analysis where methodology "appear[ed] indistinguishable from the RFLP methodology described and upheld" in previous cases]; *People v. Cooper* (1991) 53 Cal.3d 771, 812 [recently developed electrophoretic test for a particular enzyme admissible without *Kelly* hearing where electrophoretic testing had already been found generally admissible].)

Jackson argues that the presence of the two detectives in the locker room transformed the Orange Street trailing into a hybrid of a trailing and a scent lineup. In a scent lineup, "a dog sniffs an object imbued with a scent known to be from a

wrongdoer and then sniffs a line of either objects or people.  If the dog 'alerts' — that is, barks at, sniffs and paws at, sits near, or mouths a suspect, or an object touched by a suspect — the 'alert,' in the form of an alleged match of the object's scent with that of the suspect, is admitted as substantive evidence that the person identified committed the crime."  (Taslitz, *Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup* (1990) 42 Hastings L.J. 15, 17, fn. omitted.)

In *People v. Mitchell* (2003) 110 Cal.App.4th 772 (*Mitchell*), the court held that it was error to admit evidence of a scent lineup without first holding a *Kelly* hearing.  The court raised a number of questions regarding the validity of the assumptions that underlie scent lineups.  In particular, the court was troubled by the lack of evidence showing  (1) how long human scent persists on an object; (2) how storage conditions affect the persistence of human scent on an object; (3) how a dog might distinguish between different scents present on the same object; (4) whether every individual has a unique scent; and (5) what certification procedures are necessary for scent identification dogs.  (*Mitchell*, at pp. 791–793.) The prosecution did not present any scientific evidence, relying entirely on the testimony of the dog's handler.  (*Id*. at p. 791.)

The court opined that a technique may be scientific for the purposes of *Kelly* even if it is not developed in a laboratory:  "Difficulty in understanding the precise nature and parameters of a dog's ability to discriminate scents does not take this phenomenon out of the realm of science. . . . [¶]  Canine ability to discriminate scent has a physiological, and therefore in its most fundamental sense, a scientific basis." (*Mitchell*, *supra*, 110 Cal.App.4th at p. 790.)  In contrast to *Craig*, which emphasized the extent to which the reliability of dog trailing varies with the individual dog (*Craig*, *supra*, 86 Cal.App.3d at p. 915), the court in *Mitchell* stressed the opacity and apparent infallibility of a scent lineup as a basis

51

for applying *Kelly*.  "A scent identification by [a dog] appears to provide a definitive truth, with [the dog] being analogous to a machine that [the handler] (and only [the handler]) can calibrate and read."  (*Mitchell*, at p. 793.)

The court in *Mitchell* found in the alternative that the prosecution did not lay a sufficient foundation for admitting evidence of the scent lineup.  While a "history of canine performance" provided a basis for the admissibility of scent trailing, the court found no "basis for assumptions made about degradation and contamination of scent, both before and during collection, as well as the uniqueness of each person's odor, beyond the mere experiences of one trainer and one dog."  (*Mitchell*, *supra*, 110 Cal.App.4th at pp. 793–794; accord, *People v. Willis* (2004) 115 Cal.App.4th 379, 386 (*Willis*).)

*Mitchell*'s reasoning is inapplicable here.  Although Barnes testified that there were communications personnel in another room in the basement while Maggie was trailing, Jackson does not argue that their presence transformed the trail into a scent lineup, nor does he argue that as a general matter dog trailing can only be reliably conducted in areas where other people are not present.  Crucially, at no point was Maggie presented with a line of multiple people or objects and asked to distinguish among them; instead, the detectives and Jackson were waiting in different parts of the locker room.  Webb testified that she could not see Jackson when she followed Maggie past the detectives and did not see him until she turned the corner to watch Maggie jump into his lap.  Likewise, the fact that the envelope had been treated with ninhydrin and was close to six weeks old did not change the nature of what Maggie was asked to do:  follow any human scent that she could pick up from the envelope.

Accordingly, we conclude that a *Kelly* hearing was not necessary before the jury could hear the dog trailing evidence.  Evidence grounded in the ability of particular dogs to perform scent trailing on command has been admissible in

California since 1978, so long as a proper foundation is laid. (See *Craig*, *supra*, 86 Cal.App.3d at p. 915.) There is no reason to deviate from that precedent here.

However, the conclusion that *Kelly* does not apply should not be read to mean that dog trailing is not "science," that scientific findings in this area are irrelevant, or that the reliability of proffered dog trailing evidence will be discernible from the personal experience of the handler. On the contrary, dog-trailing procedures and experiments must comply with the laws of physics, chemistry, and biology. When proffered testimony describes events that exceed or violate these laws, courts must exclude it as unfounded. (See *Mitchell*, *supra*, 110 Cal.App.4th at p. 790.)

## ii. Foundation

Jackson argues that the trial court erred in failing to hold a hearing pursuant to Evidence Code section 402 before admitting evidence of the June 25, 2001 trailing and that, had such a hearing been held, the evidence would have been excluded as unreliable. We disagree. The trial court did not abuse its discretion in determining that the prosecution laid a sufficient foundation for this evidence.

"In determining the admissibility of evidence, the trial court has broad discretion. . . . A trial court's ruling on admissibility implies whatever finding of fact is prerequisite thereto. . . ." (*People v. Williams* (1997) 16 Cal.4th 153, 196 (*Williams*).) "We review the trial court's conclusions regarding foundational facts for substantial evidence. [Citation.] We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

"When the relevance of proffered evidence depends upon the existence of a preliminary fact, the trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence." (*People v. Hinton* (2006) 37 Cal.4th 839, 890.) "The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact. . . ." (Evid. Code, § 403, subd. (a).)

Evidence of dog trailing was held to be admissible in *People v. Malgren*, *supra*, 139 Cal.App.3d 234 only if the proponent made a sufficient showing as to five foundational requirements: (1) whether "the dog's handler was qualified by training and experience to use the dog"; (2) whether "the dog was adequately trained in tracking humans"; (3) whether "the dog has been found to be reliable in tracking humans"; (4) whether the dog was "placed on the track where circumstances indicated the guilty party to have been"; and (5) that the source of the scent — whether it was left at a location or on an object — has not become "stale or contaminated." (*Id.* at p. 238.) The last two factors were held to be necessary to ensure that "the circumstances of the tracking itself make it probable that the person tracked was the guilty party." (*Ibid.*) In *Malgren*, the court found that these two requirements were satisfied because "the dog was placed on the trail within 20 to 25 minutes after the intruder fled from the victims' home." (*Id.* at p. 238.)

*Malgren* further held that dog trailing evidence is insufficient to support a conviction absent some corroborating evidence, either direct or circumstantial. (*Malgren*, *supra*, 139 Cal.App.3d at p. 239.) As explained in a subsequent decision, the last two *Malgren* factors — whether the dog was placed on the trail where circumstances indicate the guilty party was and whether the trail has become stale or contaminated — "help to ensure the dog has a fresh scent, but they do not . . . corroborate that the person located is the person who was tracked.

54

The dog's actions in locating an individual require assurance that the person located is the person pursued, as well as being the person who in fact left the initial scent followed by the dog." (*People v. Gonzales* (1990) 218 Cal.App.3d 403, 409 (*Gonzales*).)

In the trial court, Jackson argued that a hearing under Evidence Code section 402 was necessary to examine the prosecutor's contention that the fifth foundational requirement (i.e., the trail was neither stale nor contaminated) was satisfied. The prosecutor made a foundational offer of proof based on the testimony at the preliminary hearing. The trial court denied Jackson's request and made a ruling on the record that the foundational requirements with regard to the dog trailing evidence had been satisfied. The record here supports the trial court's finding that an adequate foundation had been established. As discussed below, the preliminary hearing testimony of Webb, as well as the trial testimony of Dr. Harvey, Webb, and Lowry was sufficient to lay a foundation for evidence of the June 25, 2001 dog trailing.

As to the first three factors — the handler's qualifications and the training and reliability of the dog — in both her preliminary hearing testimony and trial testimony, Webb described the training that she and Maggie had undergone specifically geared toward trailing human scent. Maggie had been certified as a trailing dog by the National Police Bloodhound Association and was one of a handful of dogs participating in their advanced training group. In the spring of 2001, Webb was training with Maggie regularly, including running blind and double-blind trails. Maggie had performed successfully in at least seven other cases before June 2001. In addition, both Lowry and Dr. Harvey testified at trial to Maggie's reputed and observed reliability. This testimony was sufficient to show that Webb and Maggie had the proper training and that Maggie was able to trail reliably in June 2001.

The fourth *Malgren* factor — that the dog was placed on the trail in a place where the evidence showed the perpetrator to have been — was satisfied by evidence that the dog was presented with a scent article that the jury could infer was handled by whoever was responsible for Myers's disappearance. Testimony at trial indicated that Myers kept cash in her purse, separating bills by denomination into manila and white envelopes. There was also testimony that Myers was a tidy person and would not have left a crumpled envelope lying on the bed. There was no cash in Myers's purse when it was found. These circumstances tend to show that the guilty party handled the envelope, and Jackson does not argue otherwise.

Jackson argues that the prosecution failed to satisfy the fifth *Malgren* requirement — that the source of the scent was not stale or contaminated. The envelope was left on Myers's bed in the open air for at least half a day, i.e., the time between Monique Myers's visit at 9:00 p.m. on May 14, 2001, and the collection of the envelope by investigators on the afternoon of May 15, 2001. During that time, it could have absorbed scents from the air or investigators in the house. In addition, the envelope was treated with ninhydrin, and the envelope was stored at room temperature for 40 days before being presented to Maggie. Jackson does not contend that his scent was somehow transferred to the envelope during the period it was in storage.

Although *Malgren* set forth this fifth requirement with regard to staleness and contamination, in that case and other cases the trailing was conducted almost immediately following the perpetrator's flight. (See *Craig*, *supra*, 86 Cal.App.3d at p. 910 ["[o]ne of the first units to arrive" after police were called to the scene was "Officer Reed with an experienced, trained police dog"]; *Malgren*, *supra*, 139 Cal.App.3d at p. 237 [officer arrived with police dog less than 20 minutes after burglar had fled]; *Gonzales*, *supra*, 218 Cal.App.3d at pp. 405–406 [officer arrived

56

with police dog approximately 25 minutes after burglars had fled].) We are unconvinced that we should impose a foundational requirement that, prior to admission of dog trailing testimony, the scent presented to the dog must be shown not to be stale or contaminated. *People v. Malgren*, *supra*, 139 Cal.App.3d 234, is thus disapproved on this point to the extent it holds otherwise.

The prosecution presented testimony from Dr. Harvey as to her opinion of how long a scent could remain on an item. Dr. Harvey mentioned an unpublished ongoing study in which she "ha[d] to assume [based on her results] . . . that [a scent] could remain [on an item] as long as 7 1/2 years or possibly longer." She "would not say" that a scent would persist that long in every case, and she did not offer any criteria for determining how long a scent would persist in a particular case.

Nevertheless, all three prosecution experts opined that if a scent is not detectable on the object presented to the dog, or if the scent on the object does not match a trail, then a well-trained dog will not trail. Dr. Harvey testified that dogs are trained on "negative trails," where the dog is given a scent item that cannot be matched to any trail, either because the scent item contains no scent or because there is no trail that matches the scent on the item. The dog is trained to freeze, whine, go around in circles, or engage in some other behavior that signals to the handler that it is unable to find the trail. Webb testified that she often had Maggie run negative trails. When Maggie was unable to locate a trail, she would stop or go around in circles, indicating that she could not find a trail. Lowry also testified that well-trained dogs are trained on negative trails.

Well-trained dogs are also trained to discern the scent that matches the trail, even when multiple scents are present on the scent item or when multiple scents are in an area. Webb explained that Maggie was constantly faced with such contamination because she did not work in a sterile environment but rather in an

57

urban environment where there were always a lot of people leaving trails.  Webb also testified that scent items were often contaminated because they came from homes where many people lived and, if the scent item came from a crime scene, the scents of police officers and medical personnel were also present.  Lowry testified that these dogs are "coming into contact with a lot of contamination that we don't even know that is present."  However, if the dog is well trained and presented with a scent and a matching trail, Lowry explained, "he will ignore what he is not supposed to smell."

Dr. Harvey also testified that she did not believe in contamination:  "My understanding of what contamination would be by the courts would be that something happens that would prevent the dog from being able to smell a particular person's scent signature and then go and find them.  I've never been in a situation where the dogs could not do that."  She described an experiment where an individual laid a trail, got in a car at the end of the trail, and returned 48 hours later to the end of the trail.  In the interim period, that trail was mixed with the trails of thousands of people attending a festival.  Nevertheless, the original trails were still discernable to the dog.  She testified, "That may be considered by the court, in my opinion, contamination.  But for a bloodhound it's not."  Furthermore, Dr. Harvey testified that she "believe[d] . . . fully" that a bloodhound's ability to trail would not be affected by how many people have touched a scent item; all that matters is the extent to which that dog can reliably match a scent on the item to the scent trail.

Accordingly, the relevant question is not, as *Malgren* suggests, whether the scent is "stale" or "contaminated," but whether a well-trained dog is able to alert its handler that it is unable to discern a particular scent from the scent item or that the scent on the scent item does not have a trail.  The expert testimony in this case suggests that a well-trained dog will refuse to trail if it cannot do so given the lack

58

of a scent or the absence of a discernible trail.  The experts in this case testified that Maggie, in particular, consistently failed to trail when there was no scent or when there was no trail matching the scent.  As to whether the envelope found at Myers's house was contaminated because it was sprayed with ninhydrin, the prosecution introduced the experiments performed by Lowry and Dr. Harvey showing that a scent on a scent item was not altered by ninhydrin such that the dog was unable to trail.  Jackson contends this showing was insufficient.

The Attorney General argues that "Maggie's ability to follow Jackson's path through the police station, and unambiguously alert on him" shows that the "ninhydrin did not affect Jackson's scent on the envelope."  This argument is unsatisfactory because it simply assumes what it is intended to prove, namely, that the reason Maggie trailed to Jackson was that she detected his scent *on the envelope*.  The relevant question is whether Maggie would follow the trail of a particular scent even if the scent was altered by the ninhydrin in a way that should have precluded her from following a trail with that scent.  Maggie's training suggests that she would not.  As discussed above, the prosecution's experts repeatedly testified that if a bloodhound, trained as to when to trail and when not to trail, was presented with a scent item with no scent or a scent that did not have a trail, the dog would not trail.  Furthermore, Dr. Harvey and Webb testified that given her training and the experience of her handler, Maggie would not trail if the scent item presented to her did not also have a corresponding trail.

Jackson questions whether Maggie trailed to him not because his scent was on the scent item, but because "his scent was the most familiar, because Maggie had sniffed him three days earlier in the Spruce Street Station interview room."  But Dr. Harvey, Lowry, and Webb testified that well-trained dogs were trained to forget past scents or familiar scents and to trail only on the scent that was presented to her at that time.  Dr. Harvey explained that the harness tells the dog

that it is time to work and that when the dog is presented with a smell, the dog is aware that "this is the smell I'm supposed to trail." She testified that the dog knew, based on its training, that it would not get a reward unless it "forg[ot] the last smell you had when you were in harness. You're not going to get the love pat unless you do what I tell you to do and go look for that smell."

Webb testified that even though Maggie had smelled Jackson three days earlier, Webb had "never seen [Maggie be] able to remember . . . a trail of somebody else." She explained that she changed scents with Maggie almost every day. Maggie had been trained using decoys, where she was presented with a scent item and trails of people she knew or were familiar with. She was trained to ignore the scents that she was familiar with and instead to focus only on the scent on the scent item. Lowry also testified that dogs would need to be "re-scented" unless they were in a continuous trailing exercise, such as when a trail is intentionally dropped and the dog is asked to pick it up again at a different spot.

In sum, we do not discern a distinct issue of staleness or contamination that bears on the admissibility of dog-trailing evidence separate and apart from the other four relevant requirements. Thus, the fifth *Malgren* factor is not an independent requirement; it is satisfied by evidence that establishes the other four factors. Again, to the extent *People v. Malgren*, *supra*, 139 Cal.App.3d 234, suggests otherwise, it is disapproved on this point. If a well-qualified handler trains a dog who has reliably trailed human scent and is well trained in ignoring or forgetting past smells and in indicating negative trails, then the dog will not trail if the scent on the scent item is stale or nonexistent, or if there is no trail that matches the scent on the scent item. The dog will also be able to distinguish among scents even if there are multiple scents (so-called contamination) either on the scent item or in the trail itself.

60

Of course, an opposing party may cross-examine a witness on any of the foundational requirements and may present expert testimony to rebut any testimony in favor of dog trailing. In this case, Dr. Myers disagreed with much of the prosecution's dog trailing testimony. He opined that there was not "a good reliable measure of what the reliability of the dog is in this case." He also opined that he was not sure what exactly a dog was smelling when presented with a scent item or whether that scent was affected by environmental and personal hygiene factors. According to Dr. Myers, "some of the chemicals that are present in human scent will decompose and degrade," making contamination and staleness an issue when asking a dog to trail. This disagreement among the experts was for "the jury to resolve . . . , accepting such of it, or none of it, as they saw fit." (*People v. Carter* (1961) 56 Cal.2d 549, 560.) We conclude that the trial court did not abuse its discretion in ruling that the prosecution had laid an adequate foundation for introducing the dog trailing evidence in this case.

## B. Guilt Phase Issues

### 1. Other Errors Related to the Dog Trailing

#### a. Limitation on Cross-examination

Jackson argues that the trial court committed reversible error in barring defense counsel from "bringing out the fact" that the scent transfer unit that Dr. Harvey used in her research has been excluded under *Kelly*, *supra*, 17 Cal.3d 24, by two Courts of Appeal. (See *Mitchell*, *supra*, 110 Cal.App.4th at pp. 789, and *Willis*, *supra*, 115 Cal.App.4th at p. 385.) Jackson further argues that the court should have held a hearing on its own motion under either *Kelly* or Evidence Code section 402 with respect to the scent transfer unit (even though he did not request such a hearing) or, at the least, "informed the jury in some fashion that the machine on which Dr. Harvey relied had not been approved as reliable in the

courts of this state." The Attorney General counters that Dr. Harvey's opinion was properly based on material reasonably relied on by other experts in her field and thus there was no error.

i. Background

At trial, the following colloquy occurred between defense counsel and Dr. Harvey regarding Dr. Harvey's research:

"Q. How were these scents collected from various evidence?

"A. We used an instrument called [a] scent-transfer unit. It is an instrument that has a type of vacuum device that collects the scent onto a gauze pad made out of paper pulp. . . .

"Q. Is this a device that's been accepted in your scientific community?

"A. I don't know exactly what you mean.

"Q. Well, the area of your research, is it often referred to as a scientific community, those involved in it; correct?

"A. Yes.

"Q. The use of the scent transfer unit, is that a device that is generally accepted in your scientific community?

"A. As far as the people doing scent research are concerned, Florida International University uses the scent-transfer unit to collect scent, Oak Ridge Laboratories uses, the FBI uses it, and, yes, we use it.

"Q. To your knowledge, has the scent transfer unit ever been accepted by any court of law in a published opinion in California?"

The prosecution objected to defense counsel's last question on the grounds of relevance. The trial court heard the parties on the issue out of the presence of the jury. Defense counsel argued that the rejection of the scent transfer unit by other courts — and Dr. Harvey's knowledge of that rejection — was relevant to

the jurors' evaluation of her opinion. The court read *Mitchell*, *supra*, 110 Cal.App.4th 772, and *Willis*, *supra*, 115 Cal.App.4th 379, to mean that the device was inadmissible on foundational grounds, not because of *Kelly*. The court stated, "As far as instructing the jury that the device has not been approved in a court of law, I'm not going to do that, because it's apples and oranges. This is a research device. Certainly they are free to use any research device they want. If we're talking about the actual admissibility in court of an item of evidence, that's something entirely different."

      ii. Analysis

  "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (Evid. Code, § 720, subd. (a).) An expert can only base testimony on a matter, "whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801, subd. (b).) "When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony." (*People v. Jones* (2013) 57 Cal.4th 899, 949–950 (*Jones*).)

  "When a witness gives his personal opinion on the stand — even if he qualifies as an expert — the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are

fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument, or procedure." (*People v. McDonald* (1984) 37 Cal.3d 351, 372 (*McDonald*), overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 915; see *Jones*, *supra*, 57 Cal.4th at p. 953 [declining to apply *Kelly* to test admission of psychologist's opinion, based in part on the use of Rorschach test].)

First, Jackson's claim is forfeited. A " 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." (*People v. Seijas* (2005) 36 Cal.4th 291, 302 (*Seijas*).) A proper objection must " ' "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." [Citation.]' " (*People v. Valdez* (2012) 55 Cal.4th 82, 130 (*Valdez*), quoting *People v. Zamudio* (2008) 43 Cal.4th 327, 354 (*Zamudio*).)

Nor on the merits do we find error in the trial court's exclusion of defense counsel's questions regarding general acceptance of the scent transfer unit in California courts. Although both *Mitchell*, *supra*, 110 Cal.App.4th 772, and *Willis*, *supra*, 115 Cal.App.4th 379, found that a scent transfer unit is subject to *Kelly* and excluded evidence derived from the use of the device, these holdings were of limited relevance here.

Dr. Harvey did not use a scent transfer unit to determine whether Jackson's scent was on the envelope found on Myers's bed. Her use of the device was limited to her own research, including her published articles. Further, she did not lean on the use of the scent transfer unit, or its scientific name and appearance, to

64

buttress her credibility or burnish her expertise. Rather, she discussed the device in response to *defense counsel's* question about her research methods.

*Kelly*, *supra*, 17 Cal.3d 24, is principally directed at the risk that a jury will overvalue physical evidence because it was derived from a seemingly infallible method. (See *McDonald*, *supra*, 37 Cal.3d at pp. 372–373.) If defense counsel were concerned that mention of the scent transfer unit would deprive the jury of its ability to critically assess Dr. Harvey's credibility, eliciting her testimony on the use of this device would be a curious strategic choice.

*Kelly* is not directed at the risk Jackson highlights here, namely, that the jury will credit an expert's testimony even though her methods, unbeknownst to the jury, are novel. This risk is policed by Evidence Code section 720, under which a party may challenge a proffered expert's qualifications and the foundation for her opinion. (See *Jones*, *supra*, 57 Cal.4th at p. 949.) At trial, Jackson did not challenge Dr. Harvey's opinion as unreliable because of her use of the scent transfer unit. Thus, the trial court had no opportunity to hold a hearing on this issue.

We reject Jackson's contention that moving for a hearing would have been futile "given the trial court's persistent rulings denying such hearings." The trial court rejected his bid for an evidentiary hearing on the Orange Street station dog trailing because it found that the trailing was not a scent lineup. There is no basis for concluding that the trial court would have reached an identical conclusion with respect to Dr. Harvey's use of the scent transfer unit, given the different status of that device under the law. In any event, Jackson's failure to raise this issue at trial precludes our review.

Further, it is worth noting that previous cases have not held that the scent transfer unit is inherently flawed or unreliable, only that it is subject to *Kelly* and that there was no evidence of a scientific consensus as to their reliability. (*Willis*,

*supra*, 115 Cal.App.4th at p. 385 [" 'The scent transfer unit is a novel device used in furtherance of a new technique' and, as such, is subject to a *Kelly* analysis."], citing *Mitchell*, *supra*, 110 Cal.App.4th at p. 789.)  Because Jackson's attempt to use these cases to discredit Dr. Harvey's research could have led to juror confusion, the trial court did not abuse its discretion in excluding this evidence under Evidence Code section 352.  Nor did the trial court have any independent obligation to "inform[] the jury in some fashion that the machine on which Dr. Harvey relied had not been approved as reliable in the courts of this state."

b.  Photographs of Maggie

Jackson argues that the trial court erred in admitting photographs of Maggie because the pictures were irrelevant and engendered positive feelings toward the dog.  The Attorney General counters that the relevance of the photographs outweighed any possible prejudice they could have caused.

At trial, the court admitted an exhibit board displaying nine photographs of Maggie:  on her own, with Webb, being harnessed before trailing, in the act of trailing, and alerting on a target.  Jackson moved to exclude any images of the dog as irrelevant because there was no "contention the dog doesn't exist" or that the dog "is not a dog, or not a bloodhound."  The court denied this motion, finding that the photographs would "probably be helpful for the jury to see . . . so they can better understand the working conditions of the dog."  The court granted a similar motion to exclude the dog herself from court because her live presence "may engender some sympathetic responses from the jury, especially from pet lovers," and her presence was not necessary to the prosecution's case.

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  "The trial court has considerable discretion in determining the

66

relevance of evidence." (*People v. Williams* (2008) 43 Cal.4th 584, 634.) A court may exercise its discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (Evid. Code, § 352.) " 'A trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

We agree with the trial court that the images were relevant to understanding Maggie's working conditions. The jurors could see the type of harness she wore, her body language while tracking, and examples of how she would alert Webb that she had found the source of the scent she was following. This evidence was relevant to the jurors' assessment of Webb's credibility and their overall determination of Maggie's reliability. For example, a juror could have concluded that Maggie's purported alert was too vague to be reliably interpreted by Webb. Although the pictures could have stirred sympathy in some jurors, there is no basis to conclude that they created a substantial danger of undue prejudice. Maggie was not a puppy, and the pictures did not show her performing tricks, being affectionate toward humans, or engaging in other behavior that might elicit a strong emotional response. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the photographs.

c. Juror Misconduct

Jackson contends that the trial court erred in denying his motion for a mistrial on the basis of juror misconduct. This claim relates to an incident in which several of the jurors engaged Dr. Harvey in conversation during a break in her testimony.

67

i. Background

At trial, defense counsel asked Dr. Harvey whether she knew of any published California cases admitting evidence of a scent transfer unit. The court sustained the prosecution's objection to this question as irrelevant and defense counsel asked to be heard on the matter. While the attorneys and the judge discussed the matter in chambers, several jurors began asking Dr. Harvey questions about her dog. She responded verbally to at least one question and responded with gestures or facial expressions to certain other questions. During the lunch break, three jurors reported the conversation to the clerk, who reported it to the judge.

The judge questioned the courtroom deputy and each of the seated and alternate jurors individually about what had happened. The jurors individually testified that a few jurors asked Dr. Harvey general questions about the dog's height and weight, whether the dog drooled, and various noises the dog made. They testified that Dr. Harvey at times gestured her responses to their questions (e.g., holding up fingers to indicate that the dog weighed 135 pounds) and at other times responded verbally (e.g., saying that one of the dogs was "not my dog.") The jurors also testified that they talked and laughed among themselves about dogs in general. The court and defense counsel questioned each juror who actually interacted with Dr. Harvey as to whether they could set aside the conversation when assessing Dr. Harvey's testimony, and each said that he or she could.

Jackson moved for a mistrial or, in the alternative, the exclusion of the jurors who actively engaged in the conversation. The trial court denied the motion, explaining that "[it] does appear to the Court that no specific questions were asked about this case. I'm not trying to minimize what happened. I'm just trying to put it in context. The questions were general in nature regarding her dog

68

or dogs.  The jurors have represented to the Court that what transpired would not affect how they evaluate her credibility based upon the kinds of questions asked and her answers.  It seems reasonably apparent to me that they wouldn't."

The court then readmitted the jurors and admonished them collectively: "[W]hat happened this morning is unfortunate.  It shouldn't have happened.  And I'm admonishing all the jurors that anything that transpired during that session while the Court was with counsel going over the evidentiary issues, anything that transpired during that session, any questions asked or statements made by anybody involved in the conversations cannot be used at all in evaluating the evidence in this case or evaluating the credibility of a witness, and in particular evaluating the testimony of Dr. Harvey.  Anything that you heard or anything that was said has to be put aside and this case evaluated on what is done in open court in front of the Court's view and in front of the attorneys, and that's the way it has to be."  The court asked the jurors if they could adhere to that and they collectively stated that they could.

ii. Analysis

Jurors "convers[ing] among themselves, or with anyone else, . . . on any subject connected with the trial" is juror misconduct.  (§ 1122, subd. (a)(1).)  Juror misconduct " 'raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.' " (*In re Hitchings* (1993) 6 Cal.4th 97, 118 (*Hitchings*).)  A verdict must be reversed if the court " ' "finds a substantial likelihood" ' " that the misconduct influenced the vote of one or more jurors.  (*Ibid*.)  The presumption " ' "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm

69

to the complaining party." ' " (*Id*. at p. 119.) The "substantial likelihood" test is an objective standard. (*People v. Marshall* (1990) 50 Cal.3d 907, 951.)

"[B]ias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*People v. Nesler* (1997) 16 Cal.4th 561, 578–579 (*Nesler*).) The surrounding circumstances include "the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant." (*In re Carpenter* (1995) 9 Cal.4th 634, 654.) "[W]e accept the trial court's findings of historical fact if supported by substantial evidence, but we review independently the question of whether prejudice arose from juror misconduct." (*People v. Thomas* (2012) 53 Cal.4th 771, 819.)

There is no dispute that the conversation between the jurors and Dr. Harvey constituted juror misconduct. Jackson argues that this misconduct biased the jurors because it involved multiple jurors, occurred in the middle of Dr. Harvey's testimony, and concerned trailing dogs in a case where the reliability of dog trailing was an important issue. He stresses that the jurors' professions to the contrary are not conclusive; the jurors themselves may not have realized how this interaction shaped their perception of Dr. Harvey's credibility. The Attorney General counters that the content of the conversation was "innocuous" and that the trial court's individual voir dire and collective admonishment constituted substantial evidence in support of its conclusion that the conversation would not affect the jurors' determination of the case.

70

The content of the conversation was not inherently prejudicial. Dr. Harvey did not say anything bearing directly on the case. Although the jurors asked general questions about Dr. Harvey's dog, they did not discuss Maggie's reliability or the abilities of trailing dogs, broadly speaking. The jurors did not receive any information about how trailing dogs are trained, the circumstances in which they work, or the scientific basis for scent identification. Dr. Harvey did not discuss her own research or make any claims about the dog trailing conducted in this case. The deputy recalled a question about the use of dogs by other agencies, but there is no evidence that Dr. Harvey responded to that question or that any of the other jurors heard it. Dr. Harvey did not comment on Jackson's alleged actions or his character.

This is not a case in which a juror received information about a defendant's prior conviction (see *People v. Holloway* (1990) 50 Cal.3d 1098, 1107–1112, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1); asked one of the witnesses to clarify evidentiary issues in the case (see *People v. Pierce* (1979) 24 Cal.3d 199, 205–208 (*Pierce*)); or made erroneous statements of law to the rest of the jury during deliberations (see *In re Stankewitz* (1985) 40 Cal.3d 391, 399–400).

Second, the surrounding circumstances do not show a substantial likelihood of actual bias. (See *Nesler*, *supra*, 16 Cal.4th at pp. 578–579.) The jurors were not attempting to obtain information about the case. From their testimony, it appears that many jurors were aware that they were not supposed to converse with the witness and they attempted to ignore the conversation. Several jurors were concerned enough to report the conversation almost immediately after it took place. Because it was reported so quickly, the court was able to assess what occurred while the jurors' memories were fresh. The court questioned each juror independently to determine what was said. Most jurors remembered only a few

71

statements being made concerning information such as the size of Dr. Harvey's dog. After the individual voir dire, the court clearly and strongly admonished the jurors. Jackson put on considerable evidence calling into question the reliability of dog trailing in general and, more specifically, the procedures used in this case.

Although reports that the jurors were laughing and "cutting up" with Dr. Harvey could suggest a rapport that led some jurors to be biased in evaluating her credibility, such an inference is not compelled. "[C]ontact between a juror and a witness . . . may be nonprejudicial if . . . there is no showing that the contact related to the trial. . . ." (*Cowan*, *supra*, 50 Cal.4th at p. 507; see also *Pierce*, *supra*, 24 Cal.3d at p. 208 [suggesting that contact between a juror and a witness involving "mere social amenities unrelated to the trial" is not necessarily prejudicial].) The trial court is in the best position to observe the jurors' demeanor and determine whether such bias existed (see *People v. Debose* (2014) 59 Cal.4th 177, 202), and here the trial court questioned several jurors individually whether the improper conversation with Dr. Harvey would affect their evaluation of her testimony.

Based on an examination of the entire record, we conclude that the inference of bias was rebutted and that the trial court did not err in denying the motion. (See *Hitchings*, *supra*, 6 Cal.4th at p. 119.)

d. Webb's Opinion That Dogs Are Colorblind

Jackson argues that the trial court committed reversible error in admitting Webb's testimony that dogs are colorblind.

Dr. Myers testified about the risk of visual cueing when scent lineups are conducted using people instead of objects. "The worst examples I have seen of this is where a dog was brought into a situation where there were five individuals. As it turned out, there were seven. Four of them were sitting peaceably and one

72

was in a yellow jumpsuit and handcuffs surrounded by two officers. That's not a very good lineup. That's contributing a cue that's hard to ignore." In rebuttal, the prosecution asked Webb, "Are dogs colorblind?" She responded, "Yes, they are." The court overruled Jackson's objection that this testimony was unfounded.

A witness is qualified to offer an expert opinion if she has "special knowledge, skill, experience, training, or education sufficient to qualify [her] as an expert on the subject to which [her] testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (Evid. Code, § 720, subd. (a).)

Even assuming Webb's statement lacked foundation, this error was not prejudicial under *Watson*. (See *People v. Watson* (1956) 46 Cal.2d 818, 836–837.) Webb's testimony does not indicate that Maggie paused when passing the detectives or that she was confronted with a static choice between the detectives and defendant. Rather, her testimony suggests that Maggie was running ahead of Webb and passed by the detectives before she could see defendant. Jackson himself does not argue that this statement was prejudicial in and of itself, instead framing it as "part of the overall pattern of the trial court's rulings — anything dog-related offered by the prosecution was admissible; anything challenging their admission was a waste of time."

Jackson does not offer any reasoned explanation for how this statement prejudiced him. His argument is a criticism of the trial court's approach to the case, not a reasoned explanation of how this particular statement probably affected the verdict.

### e. Jury Instructions

Jackson argues that the trial court erred in giving the standard version of CALJIC No. 2.16 to the jury. This instruction reads: "Evidence of dog tracking has been received for the purpose of showing, if it does, that the defendant is [the] [a] perpetrator of the crime of _____. This evidence is not by itself sufficient to permit an inference that the defendant is guilty of the crime of _____. Before guilt may be inferred, there must be other evidence that supports the accuracy of the identification of the defendant as the perpetrator of the crime of _____. [¶] The corroborating evidence need not be evidence which independently links the defendant to the crime. It is sufficient if it supports the accuracy of the dog tracking. [¶] In determining the weight to give to dog-tracking evidence, you should consider the training, proficiency, experience, and proven ability, if any, of the dog, its trainer, and its handler, together with all the circumstances surrounding the tracking in question."

Although Jackson approved this instruction at trial, he now contends that the court had a duty to issue a different instruction sua sponte. He criticizes the instruction given on the grounds that (1) the foundation for the dog trailing evidence in this case was insufficient; (2) the instruction is not sufficiently cautionary; and (3) the instruction undermines the prosecution's burden of proof. Jackson suggests that an instruction like the one rejected in *Craig* would have been more appropriate: " '[D]og-trailing evidence must be viewed with the utmost of caution and is of slight probative value. Such evidence must be considered, if found reliable, not separately, but in conjunction with all other testimony in this case, and in the absence of some other direct evidence of guilt, dog trailing evidence would not warrant conviction.' " (*Craig, supra*, 86 Cal.App.3d at p. 917.)

74

"A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) Jackson forfeited this argument by failing to object, since CALJIC 2.16 correctly states the law as set forth in *Malgren* and *Gonzales*. (See *Gonzales*, *supra*, 218 Cal.App.3d at p. 414; *Malgren*, *supra*, 139 Cal.App.3d at p. 242.)

Jackson's remaining arguments are based on his contentions that this case did not concern dog trailing but rather a scent identification lineup and that an insufficient foundation was laid for the evidence. The argument that the June 25, 2001 trailing should have been considered a scent lineup was discussed earlier. (*Ante*, at pp. 50–52.) We need not consider it further in this context.

2.  Denial of Motion to Suppress Jackson's Admission

Jackson contends that the trial court erred by denying his motion to suppress statements he made during the June 22, 2001 police interview admitting to violent crimes against an elderly woman. He argues that the statements were made after he invoked his right to remain silent under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and were therefore obtained in violation of his state and federal constitutional rights. We conclude that the trial court properly admitted these statements.

a.  Background

On June 22, 2001, the morning after the attack on Mason, law enforcement officers arrested Jackson and conducted an in-custody interview at the police station. Jackson was given standard *Miranda* warnings and then voluntarily agreed to speak with the investigating detectives, Barnes and Joseph. After a number of questions, Jackson asked to stop the interview, saying: "Man just take

75

me to jail man. I don't wanna talk no more." The detectives left the room. About five minutes later, a different officer, Detective Sutton, came in and asked Jackson if he wanted some water. The conversation proceeded as follows:

"SUTTON: Were you thirsty at all? I've got some cold water if you do.

"JACKSON: No man what are you gonna do with me man?

"SUTTON: I don't know, I mean, I'm on the outside. Don't know what's going on.

"JACKSON: I need to speak to somebody right now man 'cause I need . . .

"SUTTON: Do you want them to come in and talk to you some more? Is that what it is?

"JACKSON: No I need to find out what are they, what are they gonna do man, what is . . .

"SUTTON: Well I don't know, did you want them to come back in and talk to you some more is that it? If that's all, I'll go tell 'em.

"JACKSON: Is my girl still here?

"SUTTON: I, I'm manning a desk up front so I don't know.

"JACKSON: How long am I gonna be here man?

"SUTTON: Again, I'm sorry.

"JACKSON: If they don't let me out man I will fuck up this room right now man.

"SUTTON: Well what you just need to do is just kinda take a deep breath and . . .

"JACKSON: Take a deep breath, what are you talking about man? I don't even have . . .

"SUTTON: Just kinda relax.

"JACKSON: My medicine right now man. . . . . .

"SUTTON: . . . it's unlawful for me to dispense medication.

76

"JACKSON:  Well they, they need to come on and do what they need to do man.

"SUTTON:  Okay so you wanna talk to 'em again . . . . I'll get them here and then you can talk to 'em some more and tell 'em everything you need to tell 'em okay, okay?  Is that a yes or a no?  Okay."

After the first two officers returned, the following conversation ensued:

"JOSEPH:  I understand you wanted to talk to us still?

"BARNES:  Did you say you want to talk to us again Bailey, at your request?

"JACKSON:  Yes sir.

"BARNES:  Okay what's up.

"JACKSON:  I'm just, I'm sorry man, . . . I know I did it.

"BARNES :  You know you did it.

"JACKSON:  Yeah I know I did it okay?

"BARNES:  Okay what did you do."

Jackson then went on to make a number of statements about his actions against a red-haired woman that led detectives to suspect him of crimes against Myers.

Before trial, Jackson brought a motion to suppress, arguing that his statements were involuntary, coerced, and obtained in violation of his rights under *Miranda*, the Fifth and Fourteenth Amendments of the United States Constitution, and article I, section 15 of the California Constitution.  He argued that the police improperly continued questioning him after he invoked his right to remain silent.

At a hearing on the motion, Detective Sutton testified that the other two detectives had not requested that he attempt to encourage defendant to reinitiate questioning, only to watch defendant "while they were gone from the room."  The trial court found no violation of defendant's *Miranda* rights.  It credited Detective

77

Sutton's testimony that he had not been asked to act improperly, concluded that Jackson had reinitiated communication, and held that the officers had acted in good faith in continuing the interview.

b. Analysis

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.; see *Malloy v. Hogan*, 378 U.S. 1, 6.) To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of custodial interrogation (*Miranda*, *supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation. (*Id.* at pp. 444–445.) "[I]f at any point in the interview [a defendant] invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' " (*People v. Martinez* (2010) 47 Cal.4th 911, 947 (*Martinez*), quoting *Miranda*, at p. 474.) "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards v. Arizona* (1981) 451 U.S. 477, 484– 485 (*Edwards*).) "[T]he prosecution bears the burden of establishing by a preponderance of the evidence that [a *Miranda*] waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation." (*People v. Linton* (2013) 56 Cal.4th 1146, 1171 (*Linton*).)

A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case. (*People v. Sims* (1993) 5 Cal.4th 405, 440.) "In reviewing the trial court's denial of a suppression motion on

*Miranda* and involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551 (*Duff*).) We review issues concerning the suppression of such statements under federal constitutional standards. (*People v. Nelson* (2012) 53 Cal.4th 367, 374.)

There is no dispute that Jackson validly waived his *Miranda* rights at the start of the interview and then subsequently invoked his right to remain silent. The Attorney General argues only that, after telling the officers he "[didn't] wanna talk no more," he reinitiated contact with the officers. Jackson contends that his exchange with Detective Sutton communicated only a desire to leave the room and get access to his medication, not to share information about the case.

Our review of the record indicates that the officers acceded to Jackson's desire to stop talking and that Jackson subsequently reinitiated the interview. Before the start of questioning, Jackson was fully advised of his *Miranda* rights and acknowledged that he understood them. After he asked to terminate questioning, the interviewing detectives stopped their questioning and left the room. It was only after he asked to speak with the detectives again, and Detective Sutton confirmed that this was his wish, that the detectives returned. Even then, Detective Barnes began by asking: "Did you say you want to talk to us again Bailey, at your request?" After Jackson confirmed, Barnes simply asked, "Okay what's up," rather than returning to his interrogation questioning. It was Jackson, not the detectives, who reinitiated the conversation. Furthermore, even if the detectives reinitiated the conversation after Jackson invoked his right to counsel in

79

violation of *Edwards*, Jackson's statements after reinitiating the conversation were voluntary statements to an innocuous question. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1040 ["[I]f the statement made after an *Edwards* violation is voluntary, 'the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.' " ].)

Jackson argues that Detective Sutton's comments were coercive by implying that the only way he could get the answers to his questions would be to speak to the investigators again. " 'A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 347 (*McWhorter*).) A review of the interview discloses that Detective Sutton offered Jackson water and responded that he did not know what the detectives were planning to do and that he could not lawfully administer any medications. When Detective Sutton asked, "Do you want them to come in and talk to you some more?" Jackson said, "No I need to find out what are they, what are they gonna do man, what is . . ." — at which point Detective Sutton asked again, "Well I don't know, did you want them to come back in and talk to you some more is that it?" Although these statements suggested that Jackson could find out what the detectives were planning to do by talking to them further, they did not suggest that talking to the detectives was the only way Jackson could get answers to his questions. "Insofar as a defendant's claims of involuntariness emphasize that defendant's particular psychological state rendered him open to coercion, this court has noted that '[t]he Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." ' " (*People v. Smith* (2007) 40 Cal.4th 483, 502.) There is no indication that any coercive tactics were used against Jackson.

Nor were the police officers required to readvise Jackson of his *Miranda* rights before resuming their questioning. In *Duff*, *supra*, 58 Cal.4th 527, the defendant argued that his confession should have been suppressed because he asked to stop the interview and because he was not given new *Miranda* warnings. The court held that the record showed that the detective promptly stopped questioning Duff when he asked to stop the interview and that the subsequent interview only began at Duff's request. Accordingly, it found that "no readvisement was required. 'After a valid *Miranda* waiver, readvisement prior to continued custodial interrogation is unnecessary "so long as a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' [Citations.]" [Citation.] The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and "[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights." ' " (*Duff*, *supra*, 58 Cal.4th at p. 555, quoting *People v. Williams* (2010) 49 Cal.4th 405, 434.) Here, the interview was reinitiated minutes after the break in questioning, in the same location and with the same officers.

In sum, the trial court's admission of Jackson's statements from the June 22, 2001 interview did not violate his constitutional rights.

3. Experimental Evidence

Jackson contends that the trial court erred in admitting evidence of experiments conducted by criminalist Mark Traughber because the experimental conditions were not sufficiently similar to the conditions in Myers's home. We conclude the trial court did not abuse its discretion in admitting this evidence.

a. Background

Traughber testified that he tested the carpet in Myers's hallway, the padding under the carpet, and the wood floor under the carpet for blood using two different tests, both of which produced a negative result. He said it was "common knowledge" that bleach can "obliterate" a bloodstain through oxidation. He acknowledged that, at least according to certain sources, the presence of bleach could produce a false positive result in the tests he used to check for blood. He further stated that the active ingredient in bleach, sodium hypochlorite, is highly unstable and, after the water in the bleach has evaporated, will quickly break down into salts and oxygen. The implication of Traughber's testimony was that the stain on the carpet in Myers's hallway could have been caused by bleach and that the application of that bleach could have destroyed any evidence of blood.

To solidify this testimony, Traughber subsequently conducted several experiments. The prosecution re-called him during its case-in-chief to testify about these experiments. In one experiment, he used a piece of carpet that he found in the laboratory, which was being used "to demonstrate some bloody shoe impressions." The carpet had "a little bit of residual chemical, kind of a bluish color" on it. Traughber poured bleach from the bottle onto the carpet, with a piece of butcher paper placed underneath the carpet. When he examined the carpet the next day, the color of the carpet had lightened, and he no longer noticed the odor of bleach. A test for blood yielded a "slight positive reaction." On the second day, a test for blood was negative. Based on this experiment, Traughber concluded that "sodium hypochlorite is very reactive and [during the time of experiment] all of it was consumed reacting with something in the carpet or just simply decomposing on its own or both."

In a second experiment, Traughber mixed two drops of bleach with a drop of his own blood on a piece of butcher paper. Twenty seconds later, "the blood

started turning black and then it started disappearing." After 60 seconds, the solution was clear. This confirmed Traughber's "expectations that bleach destroys bodily fluids such as blood."

Finally, Traughber poured bleach onto an unreactive plastic surface to let the bleach dry. After two days, residual salt crystals remained on the surface, which yielded a strong positive when tested for blood. After four days, there was a weak positive reaction. Traughber concluded that "sodium hypochlorite does, in fact, decompose on its own."

On cross-examination, Traughber conceded that it was 80 degrees in the Myers residence and there was no ventilation, whereas the laboratory had a lower temperature and very good ventilation.

### b. Analysis

" 'Experimental evidence has long been permitted in California trial courts. . . .' " (*People v. Bonin* (1989) 47 Cal.3d 808, 847.) " 'Admissibility of experimental evidence depends upon proof of the following foundational items: (1) The experiment must be relevant [citations]; (2) the experiment must have been conducted under substantially similar conditions as those of the actual occurrence [citation]; and (3) the evidence of the experiment will not consume undue time, confuse the issues or mislead the jury [citation].' " (*Ibid.*) The proponent of the experimental evidence has the burden to show that the conditions were substantially similar but need not show that they were absolutely identical. (*People v. Jones* (2011) 51 Cal.4th 346, 375.) We review the trial court's decision to admit experimental evidence for abuse of discretion. (*Id*. at p. 376.)

Jackson argues that Traughber's experiments were inadmissible because the "actual occurrence was in Myers's home, not the lab, and on her carpet, not the random remnant Traughber found to use." Although these experiments could have

been conducted under more rigorously similar conditions (for example, using a piece of Myers's carpet and modifying the room temperature and ventilation), the procedures used were sufficient to establish the rather limited points at issue, namely, whether bleach can destroy blood and whether dried bleach can test negative for blood. These points were further buttressed by Traughber's understanding of the underlying chemistry. It was not necessary that he conduct the experiments under identical conditions. Accordingly, the trial court did not abuse its discretion in admitting this evidence.

### 4. Insufficient Evidence of Intent to Steal

Jackson argues that the trial court failed to instruct the jury that, to convict him of robbery and to find a robbery-murder special circumstance, the jury had to find that he formed the intent to steal before killing Myers. He further argues that there was insufficient evidence as to when the intent to steal arose. He contends, therefore, that the conviction for robbery and the special circumstance finding must be set aside. We conclude that the trial court properly instructed the jury and that sufficient evidence supported the conviction of robbery and the finding of robbery-murder special circumstance.

Robbery is "the taking of personal property of some value, however slight, from a person or the person's immediate presence by means of force or fear, with the intent to permanently deprive the person of the property." (*Marshall*, *supra*, 15 Cal.4th at p. 34.) A conviction of robbery requires evidence showing that the defendant conceived the intent to steal either before or during the commission of the act of force against the victim. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 166 (*Letner*).) " '[I]f the intent arose only after the use of force against the victim, the taking will at most constitute a theft.' " (*Marshall*, *supra*, at p. 34.) For the jury to find true the robbery-murder special circumstances, it must find

84

that a defendant is guilty of first degree murder and the murder "was committed while the defendant was engaged in" a robbery.  (§ 190.2.)

### a.  Jury Instructions

At trial, the jury was instructed with CALIJC No. 3.31 (concurrence of act and specific intent), CALIJC No. 9.40 (defining robbery), CALIJC No. 8.21 (defining first degree felony-murder in the commission of a robbery), and CALIJC No. 9.40.2 (the timing of forming the intent to steal in robbery). CALIJC No. 9.40.2 provides that, if the intent to steal "was not formed until after the property was taken from the person or immediate presence of the victim, the crime of robbery has not been committed."

Jackson requested a modified version of CALJIC No. 8.81.17:  "To find the special circumstance(s) referred to in these instructions as murder occurring during the commission of a robbery, burglary or an attempt robbery or attempt burglary to be true, you must find beyond a reasonable doubt that the defendant specifically intended to rob and/or burglarize Geraldine Myers prior to, or during the course of, the infliction of the fatal wound."

The trial court denied the request and instead gave a standard version of CALJIC No. 8.81.17:  "To find that the special circumstance referred to in these instructions as murder in the commission of robbery is true, it must be proved: 1a. The murder was committed while the defendant was engaged in the commission of a Robbery; and 2. The murder was committed in order to carry out or advance the commission of the crime of Robbery or to facilitate the escape therefrom or to avoid detection.  In other words, the special circumstance referred to in these instructions is not established if the Robbery was merely incidental to the commission of the murder."  Jackson argues that this instruction did not clearly

85

inform the jury that if the intent to steal was formed after Myers was dead, then there could be no conviction for robbery.

This argument is unpersuasive. CALJIC No. 9.40.2 specifically advised the jury that in order to convict Jackson of robbery, it must find evidence that the intent to steal was formed prior to the taking of property from Myers. CALJIC No. 8.81.17 further instructed the jury that it must find beyond a reasonable doubt that the murder was committed to carry out or advance the robbery. When read collectively, these instructions informed the jury that the intent to steal must arise before or at the time of the killing.

This court has repeatedly held that when given together (as they were here), CALJIC Nos. 8.81.17, 9.40 (defining robbery), and 8.21 (defining first degree felony murder in the commission of a robbery) " 'adequately informed' the jury 'concerning the point in time the intent to steal must have been formed.' " (*Zamudio*, *supra*, 43 Cal.4th at p. 361, quoting *People v. Hughes* (2002) 27 Cal.4th 287, 360 (*Hughes*); see also *People v. Hendricks* (1988) 44 Cal.3d 635, 642–643.) " 'Because defendant's proposed instructions would merely have elaborated on these general instructions, the trial court's refusal to give them was not error.' " (*Zamudio*, *supra*, at p. 361, quoting *People v. Hayes* (1990) 52 Cal.3d 577, 626.)

Further, contrary to what Jackson claims, the jury was not required to find that his primary intent for entering Myers's residence was to steal. " '[A] jury deciding the truth of a special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was "primary". . . .' " (*People v. Dement* (2011) 53 Cal.4th 1, 48.) Instead, to find true a felony-murder special circumstance, the jury need only determine that " 'the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.' " (*Bolden*, *supra,* 29 Cal.4th at p. 554). "Concurrent intent to

86

kill and to commit an independent felony will support a felony-murder special circumstance." (*People v. Raley* (1992) 2 Cal.4th 870, 903.) Thus, whether the intent to steal was Jackson's primary or secondary motivation is inconsequential to the jury's finding of the robbery-murder special circumstance. (See *People v. Holt* (1997) 15 Cal.4th 619, 671 ["He assaulted her in order to incapacitate her and thereby facilitate the theft. That he may also have done so to facilitate the sexual assault does not compel a conclusion . . . that the force was used only to accomplish the rape and/or sodomy."].)

### b. Sufficiency of the Evidence

Jackson contends that even if the jury was properly instructed, there is insufficient evidence that he formed the intent to steal before or during the attack against Myers, and thus reversal of the robbery conviction and robbery-murder special circumstance finding is required.

In addressing a claim of insufficient evidence to support a conviction, this court " 'reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Bolden*, *supra*, 29 Cal.4th at p. 553.) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) A robbery conviction requires proof of the intent to steal arising either before or at the time that force was used. (*Marshall*, *supra*, 15 Cal.4th at p. 34.) A trier of fact may infer the intent to steal from all the direct and circumstantial evidence. (*People v. Abilez* (2007) 41

87

Cal.4th 472, 508 (*Abilez*); *Hughes*, *supra*, 27 Cal.4th at pp. 357–358 [the fact that defendant left other valuable items in a victim's home, and that there was little evidence suggesting when the intent to steal was formed, would not prevent a reasonable jury from finding that the defendant committed a robbery].)

" '[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' " (*Hughes*, *supra*, 27 Cal.4th at p. 357.) " 'If a person commits a murder, and after doing so takes the victim's wallet, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 187; see also *Letner*, *supra*, 50 Cal.4th at p. 166 [jury's reasonable conclusion that the defendants were in possession of the victim's car after the murder was sufficient on its own to support their finding of intent to steal].) The jury can also infer a defendant's intent to steal from his commission of other similar crimes. (*People v. Harris* (2013) 57 Cal.4th 804, 840–842 [evidence of an uncharged crime in which defendant had entered another woman's dwelling within walking distance of his own apartment at night and stole several items was "sufficiently similar" to support the finding of "intent" in the current robbery charge].)

We conclude that when all reasonable inferences are drawn in favor of the prosecution, the evidence was sufficient to support the jury's findings. The jury could infer from Jackson's statements that he broke into Myers's house and killed her. In addition, the jury could infer that whoever killed Myers stole a substantial amount of cash from the torn manila envelope found on her bed, as well as her car. Based on the evidence that Jackson stole Mason's purse, television, and checkbook, the jury also could infer that he had had the same intent when he broke into Myers's house. Finally, the jury could infer from Richard Shrader's

88

testimony that Jackson asked to borrow money shortly before Myers disappeared that Jackson's need for cash motivated him to break into Myers's house. (See *Abilez*, *supra*, 41 Cal.4th at p. 506 [evidence that, "just hours before the murder, defendant asked [a friend] for money" in finding that defendant formed the intent to steal before or during the murder].)

5. Challenge to the Felony-murder Special Circumstances

Jackson contends that his death sentence violates the proportionality guarantee of the Eighth Amendment to the federal Constitution because it allows him to be executed even if a killing was negligent or accidental. He asserts that the Eighth Amendment requires a finding that he killed with some culpable state of mind, such as an intent to kill or at least recklessness, and that there is simply no evidence on which a jury could determine his intent at the time Myers was killed. He argues that imposing the death penalty for negligent or accidental killings is contrary to evolving standards of decency and the laws of a majority of states, and that it fails to serve any legitimate penological purpose.

We have repeatedly held that when the defendant is the actual killer, neither intent to kill nor reckless indifference to life is a constitutionally required element of the felony-murder special circumstance. (See, e.g., *People v. Contreras* (2013) 58 Cal.4th 123, 163–166 (*Contreras*); *People v. Watkins* (2012) 55 Cal.4th 999, 1033–1034 (*Watkins*); *People v. Taylor* (2010) 48 Cal.4th 574, 661 (*Taylor*); *People v. Young* (2005) 34 Cal.4th 1149, 1204.) "[W]e have also rejected the related claim that the imposition of the death penalty under these circumstances fails to adequately narrow the class of death-eligible offenders." (*Martinez*, *supra*, 47 Cal.4th at p. 967, citing *People v. Anderson* (1987) 43 Cal.3d 1104; see *People v. Earp* (1999) 20 Cal.4th 826, 905; *People v. Stanley* (2006) 39 Cal.4th 913, 958, 968.) We decline to revisit these precedents here.

6.  Prosecutorial Misconduct in Closing Argument

Jackson contends that some of the prosecutor's closing remarks constituted misconduct in violation of his state and federal rights.  Recognizing that defense counsel's failure to object to the prosecutor's statements at trial forfeited any claim of prosecutorial misconduct on appeal, Jackson argues that the failure to object constituted ineffective assistance of counsel.

a.  Background

i.  Appealing to Passion and Prejudice

In his closing arguments, the prosecutor stated that, even in a world filled with violence, there were certain crimes that "shock[] our sensibilities."  The prosecutor asked the jury:  "Who among us did not gasp in horror and disbelief when you heard about what happened to 12-year-old Polly Klaas, stolen from her home during a slumber party while her mother slept in another room, raped and murdered by some psychopath.  Or what was your reaction when you heard about 5-year-old Samantha [Runnion], kidnapped from in front of her home in Orange County, raped and murdered and her little naked body left on a roadway?  Or Anthony Martinez, a 10-year-old in Beaumont, similarly kidnapped in front of his home?  The implications of these crimes affect us all.  We should be safe in our homes.  We want to believe that we are."

The prosecutor continued:  "Yet another type of crime, equally monstrous, equally horrendous, but far more rare, occurring far less frequently than these horrendous crimes against children.  When was the last time you heard reports or stories of someone targeting elderly single women for sexual assault and murder?  These crimes are far more rare. . . .  It takes a sick, sadistic, perverted predator to target innocent, vulnerable, elderly women living alone for vicious sexual assault."  The prosecutor also asserted that Myers had been "slaughtered" at home.

90

Jackson argues that these statements improperly appealed to the jury's passion and prejudice.

## ii. Sexual Assault

During closing argument, the prosecutor claimed that because Myers's house had not been ransacked, "[t]he person who attacked Gerry Myers, like the person who attacked Myrna Mason, their primary motivation wasn't theft. It was a concurrent or secondary motivation, yes. The primary motivation was something else: violent, vicious sexual assault."

The prosecutor continued: "Why do you think the defendant had to dispose of Gerry Myers's body? The rational conclusion is not to cover up a theft; [but] to cover up a rape. He knew his DNA was in her body and that's why he had to get rid of her body and dispose of it. Otherwise why not leave her there like Myrna Mason?"

The prosecutor explained that the minimal traces of blood in Myers's house suggested she was not violently murdered, but "more than likely, based upon all the evidence that you have, [Myers] was strangled just like Myrna Mason during the vicious, violent sexual assault that was his primary motivation."

Finally, the prosecutor explained that "the details of the commission of [the Mason] crimes, the defendant's conduct in the commission of those crimes and afterwards, the evidence that was collected during the investigation of those crimes, and the defendant's statements when he was being questioned about those crimes . . . prove beyond a reasonable doubt that he is also the one who viciously attacked and murdered Geraldine Myers."

Jackson contends that the prosecutor erred in arguing that Myers was sexually assaulted, categorizing the prosecutor's argument as an "improper propensity theory." He also argues that the prosecutor impermissibly lessened his

burden of proof by telling the jury that the facts of the Mason attack proved beyond a reasonable doubt that defendant committed the Myers crimes.

### b. Analysis

" 'To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.' " (*Linton*, *supra*, 56 Cal.4th at p. 1205.) A court will excuse a defendant's failure to object only if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).) Jackson acknowledges that defense counsel did not object to these statements at trial but argues that the failure to object constituted ineffective assistance of counsel.

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claim are, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. " ' " (*People v. Gonzales* (2011) 52 Cal.4th 254, 305.)

"Prosecuting attorneys are allowed 'a wide range of descriptive comment' and their ' " 'argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Martinez*, *supra*, 47 Cal.4th at p. 957, quoting *Williams*, *supra*, 16 Cal.4th at p. 221.) However, "[a] prosecutor's 'vigorous' presentation of facts

favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' [Citation.]" (*Hill*, *supra*, 17 Cal.4th at p. 823.)

The Attorney General argues that the prosecutor's assertion that Myers was sexually assaulted "was a reasonable inference drawn from the evidence." The prosecutor emphasized that neither Myers's nor Mason's house was ransacked and that both victims were elderly women who lived near where Jackson was staying. He also noted that bleach stains on the hallway carpet in Myers's house could have concealed semen and that the dress Myers was seen wearing earlier that day was found on the floor. Although the prosecutor could have argued from these bits of evidence that the perpetrator had a sexual motive, such argument would have been quite speculative without the additional evidence of the Mason rape and the resulting inference that what Jackson did to Mason is what he had done to Myers six weeks earlier. That comparison was the driving force of the prosecutor's argument, which is why he began by instructing the jury to begin its analysis with Mason and then argued that Myers was not stabbed, but probably strangled, like Mason. He described the similarities between the cases as "haunting" and "undeniable," and attributed them to a simple cause: the crimes were "perpetrated in an identical manner by the identical person, Bailey Jackson."

As discussed above, the evidence of the Mason rape was cross-admissible in the Myers case. Thus, the prosecutor was permitted to reiterate this evidence in his closing statement. By contrast, the prosecutor's comparison of Jackson's crimes to the highly publicized and unrelated murders and sexual assaults of children such as Polly Klaas was gratuitous at the guilt phase and therefore improper. " ' "In general, prosecutors should refrain from comparing defendants to historic or fictional villains, especially where the comparisons are wholly inappropriate or unlinked to the evidence." ' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 836.) But there is no reasonable probability that the jury

would have reached a different verdict at the guilt phase without those comments by the prosecutor.  These improper statements spanned a relatively small amount of time in an otherwise proper closing statement that focused solely on the evidence and the law in the two cases.  In addition, the statements were not likely to have affected the verdict because in addition to these statements about children, the prosecutor also made statements about the "equally monstrous" attacks on elderly women living alone, statements that were proper given the facts of this case.  We therefore reject Jackson's claim of ineffective assistance of counsel.

### 7.  CALJIC No. 2.50

Jackson argues that the trial court erred by failing to sua sponte instruct the jury with "a modified version of CALJIC 2.50, explaining the limits of the use of the Mason sex-crimes evidence in the jury's consideration of the Myers crimes." The prosecutor initially requested CALJIC No. 2.50 but withdrew the request during the jury instruction conference.  Jackson did not object to the withdrawal or separately request the instruction at trial.  He does not contend that the failure to object to the withdrawal constituted ineffective assistance of counsel, but he argues that the trial court's failure to instruct the jury allowed the prosecutor to "improperly conflate" the sexual crimes against Mason with the crimes against Myers.

Although Jackson characterizes his claim as an argument that the trial court should have given a modified version of CALJIC No. 2.50, in essence he is arguing that the evidence of the sexual assault of Mason was admissible for a limited purpose only and that the court should have so instructed the jury.  In light of our determination that the evidence of the Mason rape was cross-admissible against Jackson in the Myers case, we conclude that the trial court did not err.

94

Furthermore, CALJIC 2.50 refers to "[e]vidence . . . that the defendant committed a crime other than that for which he is on trial," which is inapplicable in this case because Jackson was charged with both crimes. The jury was instructed with CALJIC No. 17.02 that it was to decide each crime separately, and we have found that the evidence of the sexual assault of Mason was cross-admissible. Under that scenario, our case law has found CALJIC No. 17.02 to be sufficient. (*People v. Lynch* (2010) 50 Cal.4th 693, 761.) Finally, the court had no duty to give a modified version of this instruction on its own initiative absent a request. (Evid. Code, § 355.)

8. False Theory of Conviction

Jackson contends that his Sixth and Fourteenth Amendment rights to trial by jury were violated when the prosecutor presented an improper theory on which to convict him of the crime of sexual penetration of an unconscious victim with a foreign object. (§ 289, subd. (d).) He argues that his conviction and sentence on this count should be reversed.

The trial court instructed the jury with CALJIC No. 10.33, listing the four elements required to show a violation of section 289, subdivision (d): "(1) A person committed an act of sexual penetration upon another person; [¶] (2) The alleged victim was at the time unconscious of the nature of the act; and [¶] (3) The unconsciousness was known to the person committing the act; and [¶] (4) The penetration was done with the purpose and specific intent to cause sexual arousal, gratification, or abuse." CALJIC No. 10.33 defines the phrase "specific intent to cause sexual abuse" as "a purpose to injure, hurt, cause pain or cause discomfort. It does not mean that the perpetrator must be motivated by sexual gratification or arousal or have a lewd intent."

During closing arguments, the prosecutor argued to the jury that the elements of the crime of penetration with a foreign object "that need to be proven beyond a reasonable doubt . . . are sexual penetration, penetration of the sexual organs of the victim in this case. And in this case, while the victim was unconscious, which is shown by her statements and the condition she found herself in when she woke up, and it was done with the intent to gratify or abuse. As I suggested earlier, this wasn't an act of sexual gratification on the defendant's part. He was done with his sexual gratification. This was an act designed for abuse, defilement, and hate."

In his rebuttal arguments, the prosecutor remarked that "[t]he evidence indicates, and it's undisputed, he left her for dead. He strangled her until her ears bled. And then he positioned her body and put a rake in her for her to wake up with that when he lives four doors down?" The prosecutor continued: "If she doesn't regain consciousness, he is home free. . . . Except Ms. Mason was still alive, and the defendant got caught by surprise."

Jackson argues that the prosecutor's comments that he had strangled Mason and "left her for dead" invited the jurors to convict him on a "false theory," that is, that he was guilty of the charge even if he thought Mason was dead at the time of the act of sexual penetration by the foreign object. He points out that this theory allowed the jury to overlook the requirement that the defendant intended "to injure, hurt, cause pain or cause discomfort." Thus, the prosecutor's remarks allowed Jackson's conviction on this count to be based on a finding of less than all the elements of the charged offense in violation of his federal constitutional rights.

We agree with the Attorney General that Jackson's argument takes the prosecutor's statements out of context. The prosecutor's full statement makes clear he was arguing that defendant knew Mason was still alive and that a conviction on this count specifically required Mason to be unconscious. The

prosecutor's claim that Jackson "left [Mason] for dead" does not show that Jackson thought the victim was dead *at the time of penetration*; indeed, the prosecutor went on to say that Jackson "put a rake in [Mason] for her to wake up with that" and that he would be "home free" if the victim did not "regain consciousness." The trial court properly informed the jury of the elements of the crime by giving CALJIC No. 10.33 and instructed the jury before closing argument that "[i]f anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." We presume the jury understood and followed the court's instructions. (*People v. Avila* (2009) 46 Cal.4th 680, 719.)

9. Cumulative Error

Jackson contends that the cumulative effect of the pretrial and guilt phase errors relating to joinder and the admission of the dog trailing evidence resulted in a fundamentally unfair trial, in violation of the due process clause. Because we have not found error with regard to either of these issues, we reject this claim.

10. Sentencing Errors

Jackson contends that the trial court erred in imposing his sentence on the Myers burglary (count 2) to run consecutively with his sentences on the other counts because the court did not find that the burglary was separate from the murder charge for the purpose of section 654. He also argues that it was error to impose consecutive sentences for the charges of rape, oral copulation, and penetration with a foreign object. In addition, Jackson argues that the trial court erred in sentencing him for robbery because the evidence was insufficient to support this charge, a claim we have already rejected (*ante*, at pp. 87–88).

Jackson was sentenced as follows:

Count 1     Myers murder                         Death

| | | |
|---|---|---|
| Count 2 | Myers burglary | 25 years to life, consecutive to count 10 |
| Count 3 | Myers robbery | 25 years to life, stayed (§ 654) |
| Count 4 | Attempted murder of Mason | 25 years to life, consecutive to count 9 |
| | Great bodily injury | 5 years, consecutive to count 4 |
| Count 5 | Mason burglary | 25 years to life, consecutive to count 4 |
| Count 6 | Mason robbery | 25 years to life, stayed (§ 654) |
| Count 7 | Torture of Mason | 25 years to life, stayed (§ 654) |
| | Great bodily injury | 5 years, stayed (§ 654) |
| Count 8 | Rape of Mason | 25 years to life, consecutive to count 5 |
| Count 9 | Forced oral copulation of Mason | 75 years to life, tripled per Three Strikes |
| Count 10 | Penetration of Mason with a foreign object | 25 years to life, consecutive to count 8 |

### a. Section 654

Jackson argues that the trial court did not make any findings to support imposing his sentence for burglary of Myers to run consecutively to his other sentences since, he contends, there is no evidence that the burglary was part of a course of conduct separate from the murder. The Attorney General maintains that substantial evidence supports the trial court's sentencing determination.

Section 654, subdivision (a) provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." " ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' " (*Capistrano*, *supra*, 59 Cal.4th at p. 885.) Intent and objective are factual

98

questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense. (*Id*. at p. 886; *People v. Mesa* (2012) 54 Cal.4th 191, 197 (*Mesa*) [where the only punishable acts were that defendant possessed a firearm and shot each victim, court could not impose separate punishments for assault with a firearm, possession of a firearm, and participation in a criminal street gang].)

We conclude that evidence supports the trial court's imposition of separate penalties. As in *Capistrano*, Jackson was convicted of committing "two distinct crimes of violence against" Myers, burglary-robbery and murder. (*Capistrano*, *supra*, 59 Cal.4th at p. 887.) "The temporal proximity of the two offenses is insufficient by itself to establish that they were incident to a single objective." (*Ibid.*) These two crimes were necessarily accomplished through separate actions: removing the cash from the envelope on the one hand and doing violence to Myers on the other. They were not accomplished by the same physical actions. (See *Mesa*, *supra*, 54 Cal.4th at pp. 197–198.) Further, Jackson's own statement suggests that he entered the house believing it was empty (suggesting an intent to steal), and developed the intent to harm Myers only when she appeared, startling him, and he panicked, finding that he was unable to leave. This evidence is sufficient to support the trial court's determination.

Jackson's reliance on *People v. Lawrence* (2000) 24 Cal.4th 219 is misplaced. *Lawrence* addresses the mandatory nature of consecutive sentencing under the Three Strikes law (§ 667, subd. (c)(6)). But Jackson does not argue, and the record does not indicate, that the trial court believed that consecutive sentencing was mandatory. Accordingly, we reject this claim.

b. Section 667.61, Former Subdivision (g)

Jackson argues that the trial court erred in imposing consecutive sentences for the sex crimes against Mason (counts 8 through 10) because they were committed against a single victim on a single occasion.

Section 667.61, former subdivision (g), in effect until 2006, provided that sentences for the sex crimes for which Jackson was convicted "shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion." (Added by Stats. 1994, 1st Ex. Sess. 1994, ch. 14, § 1, p. 8570.) Sex offenses "occurred on a 'single occasion' if they were committed in close temporal and spatial proximity." (*People v. Jones* (2001) 25 Cal.4th 98, 107 (*Jones*) [holding that defendant should have received a single life sentence —as opposed to three consecutive sentences — for vaginally and anally raping victim and forcing her to orally copulate him in the backseat of a car during the span of one-and-a-half hours].) The rule "should result in a *single . . .* sentence . . . for a sequence of sexual assaults by [a] defendant against one victim that occurred during an uninterrupted time frame and in a single location." (*Ibid*.)

Jackson was convicted of committing three sex crimes against a single victim, Mason, during a short and continuous time period in a single location, the bedroom of her house. We agree that this constitutes "close temporal and spatial proximity." (*Jones*, *supra*, 25 Cal.4th at p. 107.) The Attorney General does not dispute this conclusion. On remand, the trial court must recalculate the noncapital portion of Jackson's sentence in light of *Jones*.

## C. Penalty Phase Issues

### 1. Challenges to the Penalty Retrial

Jackson argues that the trial court violated his rights under the due process and double jeopardy clauses of the federal and state Constitutions by allowing the retrial of the penalty phase. Jackson also contends that allowing the prosecution to

introduce evidence of new dog trailing runs conducted after the first trial violates double jeopardy.

### a. Background

The first penalty trial ended in a mistrial after the trial court found the jury deadlocked eight to four and unable to reach a unanimous decision.  Following the mistrial, defense counsel requested that the court set aside and dismiss the possibility of a death judgment on its own motion, noting that his posttrial investigation revealed the first jury to be "deadlocked 8 to 4 in favor of life imprisonment without the possibility of parole, with one or more of them expressing a 'lingering doubt' " as to Jackson's guilt.

During the penalty retrial, the prosecution introduced two new pieces of evidence.  First, Dr. Harvey presented the results of new dog trails conducted after the end of the first trial.  Second, on redirect examination, the prosecutor asked Detective Barnes about his conversation with Jackson while driving to the location where Jackson said he thought he left a body.  (See *ante*, at pp. 19–20.)

During closing argument, the prosecutor referred several times to Detective Barnes's testimony concerning Jackson's statements about bleach.  He asked the jury why Jackson would have known to use bleach to clean a crime scene and expressed disbelief that it could be mere coincidence that bleach was used to clean Myers's residence.

### b. Analysis

"We have previously found no constitutional infirmity in a death verdict rendered by a second penalty phase jury at a retrial following the first jury's deadlock on sentencing, notwithstanding that the second jury had not heard all of the guilt phase evidence." (*Taylor*, *supra*, 48 Cal.4th at pp. 633–634, citing *People v. Hawkins* (1995) 10 Cal.4th 920, 966–967; see *People v. Gurule* (2002)

101

28 Cal.4th 557, 645.) We have said the fact that California stands "among the 'handful' of states that allows a penalty retrial following jury deadlock on penalty does not, in and of itself, establish a violation of the Eighth Amendment or 'evolving standards of decency that mark the progress of a maturing society.' [Citation.]" (*Taylor*, at p. 634.) Further, we have held that a penalty retrial following jury deadlock does not violate the constitutional proscription against double jeopardy or cruel and unusual punishment. (*Ibid.*)

Jackson argues that a penalty retrial is "inherently unfair and unreliable" when the first penalty jury hangs because of lingering doubt. According to Jackson, lingering doubt is "an inherently ephemeral matter . . . not truly capable of duplication absent an exact replication of the first trial" and that allowing retrial in such circumstances would permit the prosecution to retry a case until it found a jury willing to impose death. But this may be said about any case that is retried after the jury deadlocks, as well as about the penalty phase decision more generally, which we have long recognized is a "normative conclusion based on guided, individualized discretion." (*People v. Brown* (1988) 46 Cal.3d 432, 448.) Further, the high court has recognized that " 'a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.' " (*Illinois v. Somerville* (1973) 410 U.S. 458, 470, quoting *Wade v. Hunter* (1949) 336 U.S. 684, 688–689, italics omitted.) Jackson does not provide a compelling reason why we should depart from settled law in the context of lingering doubt.

Jackson's reply brief suggests that the basis for his challenge is the introduction of new dog trailing evidence obtained between the penalty trials. We address the admission of this evidence further below.

2. Jury Selection

Jackson brings multiple challenges to the jury selection process, arguing that the trial court prejudicially erred by denying his motion for individualized death-qualification, by asking prospective jurors leading questions, and by preventing the defense from asking questions based on specific facts of the case during death qualification voir dire. He asserts these errors collectively violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

a. Sequestered Voir Dire

Prior to both penalty trials, Jackson requested that voir dire for each prospective juror be conducted individually and apart from the other prospective jurors based on our decision in *Hovey v. Superior Court* (1980) 28 Cal.3d 1 (*Hovey*). The trial court denied this request as to both juries.

"Our decision in [*Hovey*] declared, pursuant to our supervisory authority over California criminal procedure, that sequestered voir dire should be conducted in capital cases in order to promote candor and reduce the possibility that prospective jurors might be influenced by the questions to and responses by other prospective jurors. [Citation.] Code of Civil Procedure section 223, adopted in 1990 as part of Proposition 115, abrogated this aspect of our decision in *Hovey.*" (*Watkins*, *supra*, 55 Cal.4th at p. 1011.) Section 223 provides in relevant part that "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." (Code Civ. Proc., § 223.) Group voir dire may be considered " 'impracticable' " where it has resulted in " 'actual, rather than merely potential, bias.' " (*Taylor*, *supra*, 48 Cal.4th at p. 606.) We have repeatedly held that "there is no federal constitutional requirement that a trial court conduct individualized, sequestered voir dire in a capital case." (*Ibid.*, citing *People v. Lewis* (2008) 43 Cal.4th 415, 494 (*Lewis*); see *People v. Ramos* (2005) 34 Cal.4th 494, 511–513.)

103

Jackson does not argue that the trial court abused its discretion by denying individualized sequestered voir dire.  Rather, he argues that a body of social science research demonstrates that group voir dire may elicit responses that "reflect not the true feelings of the prospective jurors" but only "what they believe they should say."  Although he acknowledges that the court has repeatedly rejected constitutional challenges to  Code of Civil Procedure section 223, he asserts the court has done so based on the false assumption that group voir dire is as effective as individual voir dire in uncovering the potential biases of prospective jurors.

We decline to reconsider our precedent here.  "In view of the circumstance that defendant offered only generalized grounds for conducting individual voir dire, not specific to his case, the trial court's ruling did not fall outside the bounds of reason."  (*People v. Burney* (2009) 47 Cal.4th 203, 241.)  The rule established in *Hovey*, *supra*, 28 Cal.3d 1, was not constitutionally compelled, and "the electorate was free to abrogate it by initiative statute."  (*People v. Brasure* (2008) 42 Cal.4th 1037, 1050.)

b.  Leading Questions During Voir Dire

Jackson contends that the trial court asked leading questions during voir dire that undermined the likelihood of obtaining a fair and "accurately death-qualified" jury.  Pointing to the voir dire of the prospective jurors who became Jurors Nos. 1 and 6, Jackson claims that the trial court's leading manner of questioning "signaled to both the [jurors] being asked and the remainder of the venire what the right and appropriate answers should be."  Even though the prospective jurors assured the court they could be fair and follow the law, Jackson argues that we cannot rely on such assurances because they were made in a group setting.

Juror No. 1 was connected to law enforcement through his father, a retired police officer, and his cousin, who was in the FBI. Jackson contends the trial court "gave" Juror No. 1 the correct "answer" when it explained at length that the juror could not unfairly credit the testimony of a law enforcement officer and that the court's leading questioning left Juror No. 1 no choice other than to agree with the court. He further objects to the trial court's questioning of Juror No. 6. The trial court made clear to Juror No. 6 that he was entitled to his personal opinion "as long as that personal opinion doesn't interfere with a juror following the law and participating in our trial." Jackson contends that, based on the court's line of questioning and the group voir dire setting, it is impossible to determine whether we can believe Juror No. 6's assurances that he could fairly perform the duties of a juror.

The Attorney General argues, and Jackson concedes, that no objection to the court's manner of questioning was made at trial. Jackson has therefore forfeited his claim that the voir dire was improper. In any event, the claim is without merit. "The possibility that prospective jurors may have been answering questions in a manner they believed the trial court wanted to hear identifies at most potential, rather than actual, bias and is not a basis for reversing a judgment." (*People v. Vieira* (2005) 35 Cal.4th 264, 289; cf. *Lewis*, *supra*, 43 Cal.4th at pp. 494–495 [evidence that 16 jurors changed their questionnaire answers after being "educated" during the voir dire process did not establish actual bias].) Our examination of the record does not reveal any attempt on the part of the court to improperly lead the jurors or influence their responses.

c. Restriction of Voir Dire

Jackson claims that the trial court erred by precluding defense counsel from asking questions based on the specific facts of the case during death qualification voir dire.

i. Background

Jury selection for the penalty retrial began on September 7, 2005. At the beginning of jury selection, the trial court provided the prospective jurors with general information about a penalty trial as well as Jackson's guilt phase convictions: "In the matter of People versus Bailey Jackson a jury has previously found the defendant guilty of the first degree murder of 82 year-old Geraldine Myers on or about the 13th of May, 2001, the date of the murder. The same jury further found true special circumstance allegations that the murder occurred during the commission of robbery and burglary. [¶] The same jury found the defendant guilty of the sexual assault and deliberate and premeditated attempt murder of 84 year-old Myrna Mason, crime occurring on or about June 22nd, 2001. The jury ultimately selected in this case, as I indicated, will determine the issue of punishment."

Following the trial court's remarks, each panel of prospective jurors was asked to complete a juror questionnaire, which provided the following information about the case: "On May 13, 2001, 82 year-old Geraldine Myers disappeared from her home in the Brockton Arcade area of the city of Riverside, and she has not been heard from since. [¶] On June 22, 2001, 84 year-old Myrna Mason was robbed and sexually assaulted in her home in the Brockton Arcade area of the city of Riverside. [¶] The defendant, Bailey Jackson, has been charged with the special circumstances murder of Geraldine Myers, and with the attack on Myrna Mason."

During voir dire, in the midst of questioning a juror who indicated he would have difficulty reaching a death verdict, the trial court said: "I'm not going to

106

allow the attorneys to give you specifically any facts in the case because I don't want the jury to start prejudging any of the facts, but do you think that rendering a death verdict in this case is a realistic possibility, depending upon how you evaluate the evidence?" The prospective juror responded: "I think it's a possibility. And I understand that once the evidence is presented to you, you can make a decision based on the circumstances. I mean, it's difficult for me at this point to say 'yes' or 'no.' "

ii. Analysis

While a trial court has wide latitude to place reasonable limits on voir dire and to decide the questions to be asked (*Contreras*, *supra*, 58 Cal.4th at p. 143), "either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine a penalty after considering aggravating and mitigating evidence." (*People v. Cash* (2002) 28 Cal.4th 703, 720–721.) "Our decisions have explained that death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented." (*Id.* at pp. 721–722.)

The Attorney General correctly notes that defense counsel did not object to the trial court's questions on this ground and did not request any specific questions be asked. Jackson argues that any objection would have been futile since the court clearly stated it would not allow the attorneys to ask questions based on the

107

specific facts of the case.   Even if Jackson preserved the claim, we conclude that the trial court did not err.

Based on the information conveyed by the court before the prospective jurors began to fill out their questionnaires and before the start of oral questioning, the jurors knew the case involved robbery, burglary, sexual assault, attempted murder, and murder of elderly women.  (See *People v. Carasi* (2008) 44 Cal.4th 1263, 1288.)  On appeal, Jackson does not explain what information the jurors lacked, does not identify any questions he would have asked, and does not indicate how these questions would have altered the outcome of juror selection. Moreover, the trial court did ask fact-specific questions where relevant, such as in the case of one prospective juror who had been the victim of a residential burglary and another whose elderly grandmother had been brutally assaulted.  The trial court's efforts to determine the views of prospective jurors in light of facts specific to this case were adequate.

3.  Denial of Motion to Suppress Jackson's Admission

Jackson renews his argument that the trial court erred by admitting statements he made to investigators during his June 22, 2001 police interview.  He argues that the error was compounded during the penalty phase by the erroneous admission of additional statements he made while driving with investigators to the location where he said he left a body.

a.  Background

During Jackson's June 22, 2001 police interview, he described where he believed he had discarded a body.  The officers asked if he would drive with them to that location to help find the spot where he might have left the body.  He agreed.  During the drive, Jackson responded to questions from the officers about what he would do to clean up a crime scene.  (See *ante*, at pp. 19–20.)

108

The prosecutor asked Barnes about these statements during his redirect examination. Jackson objected. Outside the presence of the jury, defense counsel argued that the trial court's original ruling on the *Miranda* motion had considered only the statements from the police station interview and not the statements from the car ride. The admission of the latter statements had yet to be litigated, and Jackson asserted that the prosecution should have alerted defense counsel before soliciting testimony on the matter.

In response, the prosecutor argued that the statements made during the car ride were part of the interview that began in the police station, for which the *Miranda* issue had already been litigated. He also argued that there was no indication that Jackson had revoked his *Miranda* waiver at any point during the car ride. Defense counsel acknowledged that the interview during the car ride was recorded but said "it was almost impossible to hear any statements made by Mr. Jackson during that trip."

The court asked defense counsel whether "during the car trip there was any invocation or any threats made to coerce the defendant." Defense counsel responded that he could not make such a representation because he lacked information on what was said during the car ride. The court overruled the objection.

b. Analysis

We have rejected Jackson's claim that admission of his police station interview was error. (*Ante*, at pp. 75–81.) The Attorney General argues that evidence regarding Jackson's statements during the car ride was properly admitted because it was part of the same interview that began in the police station. We agree.

"After a valid *Miranda* waiver, readvisement prior to continued custodial interrogation is unnecessary 'so long as a proper warning has been given, and "the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver." [Citations.]' [Citation.] The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and '[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights.' " (*People v. Williams*, *supra*, 49 Cal.4th at p. 434.)

The transcript of the police station interview indicates that Jackson was first allowed to use the bathroom and that he and the investigators left the police station directly for the car. (See *People v. Pearson* (2012) 53 Cal.4th 306, 317.) Further, the prosecutor correctly noted that there was no indication that Jackson had revoked his *Miranda* waiver at any point during the car ride, nor does Jackson raise this argument now. The trial court properly admitted the evidence regarding Jackson's statements during the car ride.

4. Dog Trailing Evidence

a. Admission of Dr. Harvey's Testimony

Jackson argues that Dr. Harvey's testimony should have been excluded at the penalty phase because she used a scent transfer unit in some of her research. The substance of this argument tracks the points he raises with respect to the admission of Dr. Harvey's testimony at the guilt phase. (See *ante*, at pp. 61–65.) At the penalty phase, however, he moved to exclude this evidence.

Specifically, Jackson argued that Dr. Harvey should not have been allowed to testify about independent research involving a scent transfer unit or express the

110

opinions she had derived from that research. He did not argue that she was unqualified to testify as an expert on dog trailing or that her testimony lacked a foundation within the meaning of Evidence Code section 402. The trial court denied his motion, finding that *Kelly*, *supra*, 17 Cal.3d 24, governs the admissibility of "primary evidence" and does not apply to an expert's qualifications.

Our conclusion here is the same as our conclusion regarding the parallel claim above. (*Ante*, at pp. 61–65.) Cases excluding evidence derived from using a scent transfer unit to investigate the case being litigated (see *Mitchell*, *supra*, 110 Cal.App.4th at p. 789; *Willis*, *supra*, 115 Cal.App.4th at pp. 385–386) do not require the trial court to exclude testimony like Dr. Harvey's that partially relies on the scent transfer unit as a matter of law, absent a showing that she was not a qualified expert or that her opinions were unfounded.

### b. February 2005 Dog Trailing

Jackson argues that the trial court erred in admitting evidence of dog trailing that occurred between the two penalty phase trials.

In February 2005, Jackson was placed in a holding cell in the San Bernardino police station, where he had never been before. Dr. Harvey ran trails with two of her dogs to determine whether Jackson's scent was on a gauze pad that had been stored with the envelope recovered at Myers's house. The prosecution played a video of these trails during the penalty retrial, and Dr. Harvey offered the following testimony about what the videos showed.

First, Dr. Harvey scented her dog, Shelby, off the gauze pad that Traughber had placed inside the envelope found on Myers's bed in June 2001. Shelby trailed through the sally port, smelled three doors, and indicated that she wanted to go through one of them. On the other side of the door, she trailed down a corridor

111

and indicated she wanted to go through one of two doors.  Shelby arrived in another corridor containing eight locked jail cells.  Shelby smelled all eight and then stood still in between the seventh and eighth cells.  The door of the eighth cell was opened; Shelby went inside, smelled the detainees, and walked out again.  The seventh cell, containing Jackson, was opened; Shelby went inside, smelled Jackson, and walked back out.  Dr. Harvey testified that this was not an identification "to her satisfaction."  Dr. Harvey further testified that she "felt that Shelby had a good trail" but was being "rather lazy."  Because Shelby "was not trying to trail out of that area" and "was going around and around in circles," Dr. Harvey opined that "that smell that she was looking for was in that area, but for some reason she just refused to make an identification."

Dr. Harvey conducted the same task with her other dog, Dakota.  Dakota walked through the sally port and the same series of doors as Shelby had until she arrived on Jackson's corridor.  Dr. Harvey opened Jackson's cell door, Dakota entered, sniffed around, and walked out again.  Dr. Harvey gave Dakota the verbal command "show me," but Dakota just stood there and whimpered.  Dr. Harvey testified that Dakota's behavior constituted an identification:

"Q.    The fact that she did not jump up or do anything on Mr. Jackson's person, what does that indicate to you?

"A.    That indicates to me that she was still doing her job; however, she chose to do her job the way she wanted to do it, which was in direct conflict to how I would like her to do it, which is a jump-up. . . .  [E]ach dog, I guess you could say, chooses their own identification, and the handler has to learn that identification from the dog. . . .

"Q.    What does Dakota usually do?

"A.    Dakota does one of two things.  She will either do what you saw her do, or she will do a jump-up identification.

112

"Q.   And what we saw her do is simply go to the location where the individual is?

"A.   Yes, and then cry afterwards when I ask her to identify.  And she was telling me now, she already did it."

Jackson states that he moved for a *Kelly* hearing or a hearing under Evidence Code section 402 on the admissibility of this evidence, but the cited motion does not mention these trails.

We conclude that the trial court did not abuse its discretion in admitting this evidence at the penalty phase.  As was the case for the dog trailing evidence admitted during the guilt phase (*ante*, at pp. 53–61), the prosecution laid an adequate foundation for admission of this evidence.

As to the first three *Malgren* factors — the handler's qualifications and the training and reliability of both Dakota and Shelby — Dr. Harvey testified that she had been working with dogs for nine years.  (See *Malgren*, *supra*, 139 Cal.App.4th 234.)  She also testified as to the dogs' training.  Shelby was seven-and-a-half years old, and Dr. Harvey kept a record of all of her trailing trainings.  Dr. Harvey testified that Shelby was reliable, meaning that "in training [she has] been very consistent in her ability to find people under conditions where I do not have any idea where those people are or who they are."  Dakota was three-and-a-half years old, and Dr. Harvey kept a similar record of her trailing training.  Dr. Harvey testified that Dakota's reliability was the same as Shelby's.

The fourth *Malgren* factor — that the dogs were placed on the trail where the evidence showed the perpetrator to have been — was satisfied by the evidence admitted during the guilt phase:  the dogs were presented with a gauze pad from inside the crumpled envelope found in Myers's home, which had been handled by the perpetrator of the crime.  (See *ante*, at pp. 55–56.)

113

As discussed above (*ante*, at pp. 56–60), under the fifth factor, the question is not whether the scent is "stale" or "contaminated," but whether it is discernible. That factor can be satisfied by demonstrating that the well-trained dogs are able to alert their handler when they are unable to discern a particular scent from the scent item or that the scent on the scent item does not have a trail. Here, Dr. Harvey testified that even when treated with ninhydrin, her dogs were able to perform accurate trails where they followed the scent from the envelope to the person who touched the envelope, and made an identification. She further testified that her dogs were trained to trail only the scent on the scent item, even if they were familiar with another scent that had also laid a trail nearby. If there was no scent trail that matched the scent on the scent item, the dogs were trained to stand still. Thus, the fifth factor was satisfied and, accordingly, an adequate foundation was laid for admitting the additional dog trailing evidence during the penalty phase. (See *Malgren*, *supra*, 139 Cal.App.4th 234.)

Notably, neither Shelby nor Dakota positively identified Jackson. Even though Shelby began to trail immediately, indicating that she had found a match between the scent item and the scent trail, she did not unambiguously alert on Jackson. Instead, she went into and out of two locked rooms, smelling everyone in both rooms, including Jackson. Yet, as Dr. Harvey testified, Shelby did not "choose to make an identification" in her usual way. Likewise, according to Dr. Harvey, Dakota began to trail immediately following the same route, perhaps even a little faster than Shelby. She also sniffed several people behind the two locked doors, including Jackson. Yet she did not unambiguously identify Jackson. Dr. Harvey testified that she "wasn't happy with [Dakota's] identification," stating that she would "prefer [Dakota] actually jump on them, so I can see a good identification." Even after being directed to identify, Dakota refused and began to cry and whine. Dr. Harvey testified that she believed Dakota had made an

114

identification, but she had "picked" her own way of making the identification, contrary to her training.

Jackson's attorney cross-examined Dr. Harvey, eliciting testimony that her dogs made mistakes and have good days and bad days. He also elicited from Dr. Harvey that Shelby did not make a "positive alert" or a "good, decisive identification," and that Dr. Harvey did not see Dakota make an identification at all.

In sum, we conclude that an adequate foundation was laid for the dog trailing evidence during the penalty phase. But even if the admission of such evidence had been erroneous, the dogs' failure to unambiguously alert on Jackson arguably worked to his advantage, and we find no reasonable possibility that the jury would have reached a different penalty verdict in the absence of the dog trailing evidence.

5. Testimony of Sergeant Stephen Johnson

Jackson contends that the trial court erred by allowing Sergeant Stephen Johnson of the Riverside Police Department to testify that he did not know of any cases similar to Myers's disappearance at the time of the investigation.

Sergeant Johnson, who was serving as a detective in the homicide unit of the Riverside Police Department in May and June of 2001, testified that he had assisted in the investigations of both the disappearance of Myers and the crimes against Mason. Sergeant Johnson acknowledged that he knew Jackson had "made statements about taking an elderly, red-hair lady in her car and dumping her body out somewhere" and that he was not aware of any other homicide or abduction cases in the city or county of Riverside matching those facts other than the Myers case. The trial court overruled defense counsel's objections on the grounds of relevance, Evidence Code section 352, and due process.

115

Jackson argues that Sergeant Johnson's testimony lacked foundation, as there was no evidence to establish that the officer had actual knowledge of whether there had been any other similar cases in the area. (See Evid. Code, § 702, subd. (a) ["[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter."].) He notes that Riverside is a large county and that there was no evidence concerning the number of detectives in the homicide unit, the number of homicide units in the county, or that Sergeant Johnson had knowledge of crimes in the entire county. The Attorney General responds that Jackson forfeited his claim by failing to object on this ground below. Jackson counters that his objections on the grounds of relevance and prejudice properly encompassed the claim that the testimony was unfounded.

"[W]e have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." (*Seijas*, *supra*, 36 Cal.4th at p. 302.) " 'Although no "particular form of objection" is required, the objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." [Citation.]' " (*Valdez*, *supra*, 55 Cal.4th at p. 130, quoting *Zamudio*, *supra*, 43 Cal.4th at p. 354.) "A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal." (*People v. Marks* (2003) 31 Cal.4th 197, 228.) Here, Jackson forfeited his claim that Sergeant Johnson's testimony lacked foundation by failing to object on this ground at trial. (Cf. *People v. Fuiava* (2012) 53 Cal.4th 622, 671 [trial objection that evidence was nonresponsive was insufficient to preserve on appeal claim that that evidence was irrelevant, lacked a proper foundation, and prejudicial]; *Valdez*, *supra*, 55 Cal.4th at p. 130 [trial

116

objection that evidence was "irrelevant, cumulative, lacking in foundation, or prejudicial" was insufficient to preserve for appeal claim that testimony was inadmissible character evidence under Evid. Code, § 1101].)

Even if we were to address the merits of the claim, we would find no error. Sergeant Johnson's testimony was based on his personal knowledge and experience as a detective in the homicide unit of the police department assisting in the investigations of the crimes against both Myers and Mason, which was sufficient.

6. Prosecutorial Misconduct in Closing Argument

Jackson contends that the prosecutor committed several acts of prejudicial misconduct during the penalty phase closing argument. He argues that insofar as these claims are forfeited, the failure of trial counsel to object amounted to ineffective assistance of trial counsel.

"The same standard applicable to prosecutorial misconduct at the guilt phase is applicable at the penalty phase. [Citation.] A defendant must timely object and request a curative instruction or admonishment." (*Martinez*, *supra*, 47 Cal.4th at p. 963.) A defendant's "failure to object and request an admonition waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective." (*Arias*, *supra*, 13 Cal.4th at p. 159.) By failing to object, Jackson forfeited his claim of prosecutorial misconduct, and we turn to his claim of ineffective assistance of counsel.

Jackson's claim is also meritless. Having reviewed the language to which Jackson objects, we conclude there is no basis for finding prejudicial error. In his penalty phase closing argument, the prosecutor told the jury that "[s]omething happened in the hallway regardless of how the defense wants to imply or insinuate it could have happened two days before, one day before. She could have dropped

the bleach there by accident.  The circumstantial evidence is, no, Bailey Jackson threw down some Clorox to cover up evidence.  [¶] Blood semen on that carpet.  And Bailey Jackson removed, disposed of her body.  He is concerned about trace evidence on the carpet.  Where else would trace evidence be deposited in a sexual assault?"

He further argued:  "What is there that suggests in this case that the attack on Gerry Myers was sexually motivated like the attack on Myrna Mason, which they're conceding is beyond all doubt.  Her house wasn't ransacked, just like Myrna Mason's.  [¶] Showing that the primary motive of the individual that went in there was not theft, a property crime.  The purse was left on the chair, just like the purse was left in the trash can with money in it.  [¶] Her dress was on the floor in the bedroom.  This wasn't a sexual [*sic*] motivated attack, why is her dress on the floor in that bedroom?  There is no other explanation but it is forcibly removed from her.  When?  Mother's Day, 5-13-01. . . .  [¶] We know [defendant] has the opportunity.  He is in the neighborhood.  And we know from what they conceded he likes to take old ladies by surprise.  There is no qualms, no hesitation, no reservations about doing that.  We know that, they admitted it.  Why?  Money and sex. . . .  [¶] There is no distinction.  No dissimilarities in the manner in which these crimes were committed.  Sexual assault versus no evidence of sexual assault.  There is some indication it was sexually motivated based upon the similarity of the person that attacked Geraldine Myers is left [*sic*].  The residence it is not ransacked.  The purse is even left there.  Minimal things are taken."

As he did in the guilt phase, the prosecutor in closing argument mentioned the murders of five-year-old Samantha Runnion, 12-year-old Polly Klaas, and 10-year-old Anthony Martinez to highlight the horror of certain crimes.  He then stated, "These horrendous crimes shock us deeply, disturb us, and they cause us to realize a number of things:  One, there are evil predators that exist in our

community. Exist to do us harm. Two, we are not safe in our own homes. And, number three, we must condemn these crimes and these criminals with every fiber of our being."

As discussed above (*ante*, at pp. 92–93), the prosecutor's arguments regarding Myers's dress and the condition of her house were not improper. Furthermore, because the evidence of the Mason rape was fully cross-admissible (*ante*, at pp. 21–35), the prosecutor was permitted to discuss the Mason rape in connection with the Myers disappearance and encourage the jury to infer that the crimes were connected through a common plan and intent to sexually assault elderly women.

In addition, the prosecutor's comparison of Jackson's crimes to the murders and sexual assaults of children was permissible at the penalty phase. " ' "[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Williams*, *supra*, 16 Cal.4th at p. 221; see *People v. Gamache* (2010) 48 Cal.4th 347, 371.) Here, unlike in the guilt phase, the prosecutor's references to the child murders and sexual assaults illustrated a larger point about how particularly brutal crimes against the most vulnerable in our society — children and elderly women — must be punished, especially when committed in their homes. In context, the statements were permissible and did not constitute misconduct.

Because there was no basis for objection, we therefore reject Jackson's claim of ineffective assistance of counsel.

7. Jury Instructions

Jackson argues that the trial court erred by refusing to instruct the jury with several requested instructions related to his lingering doubt defense. On appeal, he

119

renews his objections as to three requested pattern CALJIC instructions —

No. 2.16 (dog-tracking evidence), No. 2.01 (sufficiency of circumstantial evidence), and No. 2.71 (admissions by defendant) — as well as one special instruction concerning the scent transfer unit used by investigators.  He argues that the trial court's failure to give these instructions constitutes reversible error in violation of the Sixth, Eighth, and Fourteenth Amendment rights to due process, to present a defense, and to a fair and reliable penalty determination.

### a.  CALJIC No. 2.16

Jackson contends that the trial court erred by refusing to instruct the jury with at least a modified version of CALJIC No. 2.16, which concerns the corroboration needed for dog trailing evidence when inferring guilt.  (See *ante*, at pp. 73–75.)  The trial court declined to give the instruction on the ground that doing so "would be encouraging the jury to relitigate and evaluate the issue of guilt. . . .  [T]o give them a pinpoint instruction on the sufficiency of dog tracking evidence . . . goes to reasonable doubt in [the] original conviction."  Jackson argues that this was not a valid reason to deny his request.  He further argues that the reliability of the dog trailing was crucial to the question of lingering doubt, which was squarely at issue during the penalty retrial.  He points out that the prosecution reintroduced much of its guilt phase evidence, along with evidence of the two additional trails Dr. Harvey conducted at the San Bernardino station.

We have explained that the role of the penalty phase jury is not to reassess the defendant's guilt but to "merely weigh[] the factors enumerated in section 190.3 and determine[] 'whether a defendant eligible for the death penalty should in fact receive that sentence.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 263, quoting *Tuilaepa v. California* (1994) 512 U.S. 967, 972.)  While a " 'defendant may urge his possible innocence to the jury as a factor in mitigation' " (*People v.*

120

*Souza* (2012) 54 Cal.4th 90, 133), "[a]s a matter of law, the penalty phase jury must conclusively accept [the determinations of the guilt phase jury]." (*People v. Harrison* (2005) 35 Cal.4th 208, 256.)  Neither state nor federal law requires a trial court to instruct a penalty jury to consider lingering doubt as a factor in mitigation. (*Id.* at p. 255.)  We find no error in the trial court's refusal to give CALJIC No. 2.16.

### b.  CALJIC No. 2.01

Jackson contends that the trial court prejudicially erred by denying his request to instruct the penalty phase jury with CALJIC No. 2.01, which provides in pertinent part:  "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion."  The trial court declined the request, stating that it "would just be encouraging the jury to relitigate the actual convictions in this case" and that such an instruction was not "necessary or appropriate."  Instead, the trial court instructed the jury with CALJIC No. 2.00, which defines "direct" and "circumstantial."

We conclude that the trial court's reasoning was correct for the reasons regarding CALJIC No. 2.16, above.  The proper assessment of circumstantial evidence was primarily a matter for the guilt phase jury.  It was therefore within the court's discretion to determination that instruction would lead to confusion and inefficiency at the penalty phase, and decline to give it.  (See *People v. Edwards* (2013) 57 Cal.4th 658, 766 ["Because there is no federal or state right to an instruction on lingering doubt [citation], there is similarly no federal or state right to an instruction on circumstantial guilt phase evidence in aid of a penalty phase lingering doubt argument."].)

121

### c. CALJIC No. 2.71

As noted, the prosecutor introduced evidence of Jackson's statements during his in-custody police interview on June 22, 2001 about "stabbing, killing, and disposing of a body of an elderly woman." The prosecutor also introduced Detective Barnes's testimony about his conversation with Jackson while driving to find Myers's body. (See *ante*, at pp. 19–20.)

Jackson requested the court to instruct the jury with CALJIC No. 2.71: "An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part. [¶] [Evidence of an oral admission of [a] [the] defendant should be viewed with caution.]" The trial court denied the request, finding the instruction went to the prosecution's "burden of proof beyond a reasonable doubt to prove the elements charged against the defendant" and did not apply "at this stage of the case." Jackson argues that this was prejudicial error.

"The purpose of the cautionary language in CALJIC No. 2.71 is to assist the jury in determining whether the defendant ever made the admissions. [Citations.] For this reason, the cautionary language is inapplicable to defendant's *recorded* admissions." (*People v. McKinnon* (2011) 52 Cal.4th 610, 679.) Therefore, CALJIC No. 2.71 should not be given if "the oral admission was tape-recorded and the tape recording was played for the jury." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200.) Jackson's station interview with police investigators was recorded, and the trial record indicates the jury listened to those recordings. Thus, there was no reason for the trial court to provide a cautionary instruction.

Jackson's statements to Detective Barnes while in the car were also recorded, but the recording was never played for the jury. Although defense counsel objected to Barnes's testimony, noting that "it's almost impossible to hear any statements made" by Jackson on the audio recording, defense counsel did not contest the accuracy of Barnes's recollection on recross-examination and never disputed Barnes's "account of what defendant said, which was fully consistent with the transcript of the taped interrogation." (See *People v. Ervine* (2009) 47 Cal.4th 745, 781–782.) Jackson does not argue on appeal that the jury might have wrongly concluded that he made the statements to which Barnes testified. And again, guilt was not at issue in the penalty phase. Accordingly, we find no error.

d. Instruction on Scent Transfer Units

Finally, Jackson contends that the trial court prejudicially erred by rejecting defense special instruction L, which stated: "The jury is hereby advised that the court has taken judicial notice of the following fact which you must accept as true: [¶] The 'scent transfer unit' device or STU-100 constitutes a novel scientific technique, which no appellate court in the State of California has found to have been accepted as legally reliable or generally accepted in the relevant scientific community."

Jackson argues that this instruction was required because the "fact that the [scent transfer unit] was an unproven device was necessary information for the jury to have in order to evaluate the validity of Dr. Harvey's experiments purporting to validate dog-sniff identifications." This is another variation of the argument we rejected above (*ante*, at pp. 61–66), and Jackson offers no reason why we should reach a different conclusion here.

123

8.  Robbery-murder Special Circumstance Allegation

Jackson argues that because there was insufficient evidence to support the robbery conviction, there was insufficient evidence to support the robbery-murder special circumstance allegation.  But we have determined that there was sufficient evidence to support the robbery conviction.  (*Ante*, at pp. 87–89.)

9.  Challenges to California's Death Penalty Scheme

Jackson raises a number of challenges to the constitutionality of California's death penalty scheme that we have previously considered and rejected.  He provides no persuasive reason for us reexamine our conclusions, and we therefore reject his challenges as follows:

"Section 190.3, factor (a), which allows the jury to consider the 'circumstances of the crime' in determining whether to impose the death penalty, is not unconstitutionally vague, arbitrary or capricious.  [Citations.]" (*Cowan*, *supra*, 50 Cal.4th at p. 508.)

" 'The federal Constitution does not impose on the prosecution a burden of proof as to penalty, and the state need not prove beyond a reasonable doubt whether "aggravating circumstances exist, that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate penalty." [Citation.]  Nor does the federal Constitution require that the jury be unanimous on which aggravating factors apply.' " (*People v. Duenas* (2012) 55 Cal.4th 1, 27–28.)

We find no constitutional violation in allowing the jury that adjudicated a defendant's guilt to evaluate evidence of other uncharged crimes under section 190.3, factor (b).  (See *People v. Hawthorne* (1992) 4 Cal.4th 43, 76–77.)  Of course, Jackson had a different jury decide his penalty.

Section 190.3, factor (i), which permits the jury to consider the defendant's age in deciding whether to impose the death penalty, is not unconstitutional. (*People v. Mills* (2010) 48 Cal.4th 158, 214.)

"CALJIC No. 8.85 is both correct and adequate." (*People v. Valencia* (2008) 43 Cal.4th 268, 309.) The sentencing factors set out in CALJIC No. 8.85 are not unconstitutionally vague or arbitrary, and the trial court is not required to delete inapplicable sentencing factors from the instruction. (*People v. Famalaro* (2011) 52 Cal.4th 1, 43; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1364 (*McKinzie*)). "The use of certain adjectives such as 'extreme' and 'substantial' in the list of mitigating factors in section 190.3 does not render the statute unconstitutional." (*People v. Thompson* (2010) 49 Cal.4th 79, 144.)

California's capital punishment scheme adequately narrows the class of defendants eligible for the death penalty consistent with the Eight Amendment. (*Cowan*, *supra*, 50 Cal.4th at p. 508.)

"[T]he absence of a penalty phase instruction on the reasonable doubt standard, or any standard of proof regarding aggravating and mitigating evidence, does not violate a capital defendant's constitutional rights." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1277; see *Kansas v. Carr* (2016) 577 U.S. __, __ [136 S.Ct. 633, 642] ["[O]ur case law does not require capital sentencing courts 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt.' "].)

" 'Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude

125

beyond a reasonable doubt that death is the appropriate penalty.' " (*People v. Williams* (2013) 58 Cal.4th 197, 295.)

Nor is the trial court constitutionally required to inform the jury that they must return a sentence of life without parole if they determine mitigation outweighs aggravation. (*People v. McDowell* (2012) 54 Cal.4th 395, 444.)

The penalty phase instruction that jurors may impose a death sentence only if the aggravating factors are "so substantial" is not impermissibly vague or ambiguous. (*McKinzie*, *supra*, 54 Cal.4th at p. 1361.)

Neither intercase proportionality nor disparate sentence review is constitutionally compelled. (*People v. Banks* (2014) 59 Cal.4th 1113, 1207; *People v. Eubanks* (2011) 53 Cal.4th 110, 154.) " '[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law. . . .' " (*People v. Maciel* (2013) 57 Cal.4th 482, 553.)

"The death penalty as applied in this state is not rendered unconstitutional through operation of international laws and treaties." (*People v. Williams*, *supra*, 58 Cal.4th at p. 295.) We have in the past rejected defendant's argument that its use "as a regular punishment for substantial numbers of crimes" is contrary to "international norms of human decency" and violates the Eighth and Fourteenth amendment of the United States Constitution. (*McKinzie*, *supra*, 54 Cal.4th at p. 1365.)

As this court has consistently held, California's death penalty statute does not constitute cruel or unusual punishment under the Eighth Amendment. (*McWhorter*, *supra*, 47 Cal.4th at p. 379.) "Even when [the above objections] are considered collectively, there is no violation of the California Constitution or the federal Constitution." (*People v. Houston* (2012) 54 Cal.4th 1186, 1233.)

126

In addition, Jackson filed a supplemental letter brief arguing that the Supreme Court's recent decision in *Hurst v. Florida* (2016) 577 U.S. __ [136 S.Ct. 616] renders California's death penalty jurisprudence with regard to aggravating circumstances unconstitutional. In Florida capital cases, an advisory jury makes a recommendation to a judge, who then makes findings as to aggravating and mitigating factors and determines the sentence. The high court determined that such a procedure is contrary to the Sixth Amendment right to a jury trial.

In our recent decision in *People v. Rangel* (2016) 62 Cal.4th 1192, 1235, footnote 16, we addressed how our sentencing scheme differs from Florida's: "Here, a jury weighs the aggravating and mitigating circumstances and reaches a unanimous penalty verdict that 'impose[s] a sentence of death' or life imprisonment without the possibility of parole. (Pen. Code, § 190.3; see *id.*, § 190.4.) Unlike Florida, this verdict is not merely 'advisory.' (*Hurst*, at p. 622.) If the jury reaches a verdict of death, our system provides for an automatic motion to modify or reduce this verdict to that of life imprisonment without the possibility of parole. (Pen. Code, § 190.4.) At the point the court rules on this motion, the jury 'has returned a *verdict or finding* imposing the death penalty.' (Pen. Code, § 190.4, subd. (e), italics added.) The trial court simply determines 'whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented.' (*Ibid.*)"

10.  Cumulative Error

Jackson argues that he was prejudiced by the totality of asserted penalty phase errors. But we have found no penalty phase error, so there is no prejudice to cumulate.

## CONCLUSION

We remand to the trial court to recalculate the noncapital portion of Jackson's sentence.  In all other respects, we affirm the judgment.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Jackson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S139103
**Date Filed:** August 1, 2016

_____

**Court:** Superior
**County:** Riverside
**Judge:** Patrick F. Magers

_____

**Counsel:**

Richard I. Targow, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard I. Targow
Post Office Box 1143
Sebastopol, CA  95473
(707) 829-5190

Tami Falkenstein Hennick
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2274